**In re Alfred R. FRENCH, Charlene A. French, Debtors.**

**Bankruptcy No. 94–41872–HJB.**

United States Bankruptcy Court, D. Massachusetts.

Nov. 17, 1994.

Russell S. Chernin, for debtors.

Susan Luttrell Burns, for G.L.B. Corp.

Cecilia Calabrese, Chapter 13 Trustee.

## MEMORANDUM OF DECISION

HENRY J. BOROFF, Bankruptcy Judge.

Before the Court for decision are two motions, namely "Debtors' Motion to Confirm Modified Plan, or in the Alternative, to Convert Case to a Proceeding under Chapter 11" ("Motion to Confirm Modified Plan") and "Objection By G.L.B. Corp. to Debtors' Modified Plan of Adjustment" ("Objection to Debtors' Modified Plan").

### A. *Factual Background*

On April 25, 1994, the debtors, Alfred R. French and Charlene A. French (the "Debtors") filed the instant Chapter 13 Petition.

On June 6, 1989, the Debtors, jointly and severally, executed a "Guaranty of All Liability"[1] (the "Guaranty") of Pioneer Valley Renovators, Inc.[2] ("PVR") to Ludlow Savings Bank ("Ludlow") in connection with borrowings by PVR from Ludlow[3], and, to secure said Guaranty, granted to Ludlow a mortgage (the "June Mortgage") on the Debtor's residence in Chicopee, Massachusetts (the "Property"). The June Mortgage also granted to Ludlow a security interest in "any deposits, securities or other property of the [Debtors] which at any time are within [the mortgagee's] possession or control[.]" Additionally, the June Mortgage included the following language:

> There is included herein as part of the realty all portable or sectional buildings at any time placed upon said premises, and all furnaces, ranges, heaters, plumbing, gas and electric fixtures, screens, mantels, shades, screen doors, storm doors and windows, oil burners, gas or electric refrigerators and all other fixtures of whatever kind and nature at present or hereafter installed in or on the granted premises in any manner which renders such articles usable in connection therewith so far as the same are or can by agreement of parties be made a part of the realty, and all material apparatus or supplies intended to enter into the construction, repair or remodeling of the buildings on said premises, or placed therein or thereon prior to the full payment and discharge of the mortgage.

(hereinafter the "Appurtenances").

On April 25, 1990, PVR borrowed approximately $48,500 from Ludlow evidenced by a

---

1. The "Guarantee of all Liability" provided in part:

   the undersigned (jointly and severally, if more than one) hereby unconditionally guarantee(s) to you full and prompt payment at maturity, including any accelerated maturity, of any and all liabilities owed to you by [Pioneer Valley Renovator's, Inc.]. As used herein, "Liabilities" means any and all liabilities or obligations of the Borrower to you of every kind and description, direct or indirect, primary or secondary, absolute or contingent, due or to become due, now existing or hereafter arising,

   regardless of how they arise or what agreement or instrument they may be evidenced or whether evidenced by any agreement or instrument.

   See Exhibit "C" of Memorandum of Law in Support of Objection.

2. The Debtor, Alfred French, was President of Pioneer Valley Renovators, Inc.

3. The briefs filed by the parties do not indicate whether PVR granted a security interest to Ludlow in any of the assets of PVR.

promissory note (the "PVR Note") which matured by its own terms on April 25, 1994.[4] Additionally, on April 28, 1992, Alfred French and Stephen J. Lajzer, a non-debtor, borrowed an additional $25,000 from Ludlow evidenced by a promissory note (the "Individual Note"). On October 28, 1992, the PVR Note, the Individual Note and June Mortgage were assigned to G.L.B. Corp. ("G.L.B.").

After commencing the instant Chapter 13 case, the Debtors filed their schedules[5] and Chapter 13 Plan on May 10, 1994. The Chapter 13 Plan was subsequently amended on June 22, 1994 (the "Amended Plan"). Through the Amended Plan, the Debtors seek to pay Ludlow (now owed the sum of $52,000) the monthly sum of $418.41 outside of the Plan. The Amended Plan further provides "[t]his amount is sufficient to amortize the obligation for a period of 30 years at the interest rate of 9%. However, any remaining balance of interest or principal will be repaid within five years of confirmation."[6]

On June 28, 1994, G.L.B. filed the "Motion of G.L.B. Corp. to Dismiss Case or, in the Alternative, for Relief from Stay" ("Motion to Dismiss") and Objection to Debtor's Modified Plan. The Debtor responded by filing the Motion to Confirm Modified Plan. All three motions were marked for hearing.

Through pleadings and oral argument presented at the hearing, and in response to issues raised in G.L.B.'s Objection to Modified Plan, the Debtors make three (3) arguments. Firstly, the Debtors assert that because the mortgage securing G.L.B.'s claim is not a purchase money mortgage (instead, it secures a guaranty of a commercial note), it is not entitled to protection from the anti-modification provisions of 11 U.S.C. § 1322(b)(2)[7] as interpreted by the Supreme Court in *Nobelman v. American Savings Bank*, —— U.S. ——, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993). Secondly, the Debtors argue that § 1322(b)(2)'s protection does not extend to G.L.B.'s claim because the June Mortgage includes a security interest in collateral in addition to the Debtors' residence. Thirdly, the Debtors maintain that § 1322(b)(3)[8] permits a debtor to cure any default, including a default on a matured note, allowing such a debtor to pay the matured obligation over the life of the Chapter 13 plan, pursuant to 11 U.S.C. § 1325(a)(5)(B).

G.L.B. argues that (1) the anti-modification provisions of § 1322(b)(2) are not limited to purchase money mortgages, (2) its security interest in the Appurtenances is not the type of "additional" security interest that would deprive G.L.B. of § 1322(b)(2)'s protection from modification, and its security interest in "deposits" would not effect such a result because the Debtors had no deposits with the mortgagee at the time of case commencement, and (3) the Debtor's reliance on the general language of § 1322(b)(3) to restructure a matured obligation is erroneous.

At the hearing, G.L.B. agreed to continue its Motion to Dismiss generally. The Court took the remaining motions under advisement.[9]

---

**4.** The briefs are unclear as to how much of the PVR Note constitutes a renewal of the 1989 obligation.

**5.** Schedule "A" lists the value of the Property in the amount of $105,000. Schedule "D" lists the following creditors holding secured claims on the Property: (1) Fleet Funding Co.—$14,000; (2) Ludlow—$46,329.95; (3) Mr. R.A. French—$57,300; and (4) Springfield Lumber Co.—$16,000.

**6.** Not before the Court is whether a Chapter 13 Debtor can modify a secured claim and pay the modified obligation *outside* of the Plan.

**7.** Section 1322(b)(2) provides:

Subject to subsections (a) and (c) of this section, the plan may—

**8.** Section 1322(b)(3) provides:

Subject to subsections (a) and (c) of this section, the plan may—
(3) provide for the curing or waiving of any default.
11 U.S.C. § 1322(B)(3).

**9.** In the event that their Motion to Confirm the Modified Plan is denied, the Debtors request that the case be converted to Chapter 11 of the Bankruptcy Code.

(2) modify the rights of holders of secured claims, other than a claim secured only be a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims[.]
11 U.S.C. § 1322(b)(2).

## B. *Discussion*

### (1) *Non Purchase Money Mortgages Under § 1322(b)(2)*

■ In support of their contention that § 1322(b)(2) does not protect G.L.B.'s claim from modification, the Debtors argue that G.L.B.'s claim is distinguishable because it arose from a guaranty of a corporate debt. Moreover, the Debtors assert that they entered into a loan transaction which was more in the nature of a "commercial" transaction than a typical home-lending consumer transaction. The Debtors point to the § 1322(b)(2) legislative history which indicates that Congress intended to extend special protection to the home mortgage industry. *See Nobelman,* — U.S. at —, 113 S.Ct. at 2112; *see also Grubbs v. Houston First American Sav. Ass'n,* 730 F.2d 236, 246 (5th Cir.1984) (Congress limited the scope of the anti-modification provision to real estate mortgages securing the debtor's principal residence "in response to perceptions, or to suggestions advanced in the legislative hearings ... that home-mortgagor lenders, performing a valuable social service through their loans, needed special protection against modification[.]").

While the legislative design to protect the home-lending industry is apparent, this Court is unconvinced that Congress intended to protect *only* purchase money mortgages. *See Allied Credit Corp. v. Davis (In re Davis),* 989 F.2d 208, 210 (6th Cir.1993) ("[T]he language of § 1322(b)(2) is clear and unambiguous on its face and does not permit the interpretation that the statute has application only to 'enabling' loans."). *See also In re Diquinzio,* 110 B.R. 628, 629 (Bankr. D.R.I.1990). Also, the statute clearly states that the rights of a 'holder of a secured "claim" is entitled to protection if it is "secured only by a security interest in real property that is the debtor's principal residence." *See* 11 U.S.C. § 1322(b)(2). The Bankruptcy Code provides a broad definition of "claim" under the general provisions of 11 U.S.C. § 101(5).[10] The Supreme Court has also indicated that Congress intended to broadly define "claim" under the Code. *See Pennsylvania Dept. of Public Welfare v. Davenport,* 495 U.S. 552, 558, 110 S.Ct. 2126, 2130–31, 109 L.Ed.2d 588 (1990). Therefore, although G.L.B.'s claim arose out of Debtors' guaranty through a so-called "commercial" transaction, it still qualifies as a "claim" within the meaning of the Code. Accordingly, the Court rejects the notion that § 1322(b)(2) only protects purchase money mortgages securing the Debtor's principal residence.

### (2) *"Additional" Security Interests Under § 1322(b)(2)*

#### (a) *The Appurtenances*

■ The Debtors assert that the so-called "boilerplate" language included in the June Mortgage, which language provides the mortgagee with a security interest in the Appurtenances, removes the mortgagee's claim from the protection against modification contemplated by § 1322(b)(2).

Prior to *Nobelman,* various courts struggled to determine whether additional collateral such as "rents", "profits", "fixtures" or "replacements and additions" removed a residential mortgagee's claim from the protection of § 1322(b)(2). *E.g., In re Davis,* 989 F.2d 208 (language in deed of trust conveying "rents, royalties, profits, fixtures thereto appertaining" did not remove protection from modification in § 1322(b)(2)); *Sapos v. Provident Institution of Savings,* 967 F.2d 918 (3rd Cir.1992) (additional collateral which included "household appliances", "rents", "profits" and "appliances" securing residential mortgage removed mortgagee's claim from protection under § 1322(b)(2)); *Wilson v. Commonwealth Mortgage Corp.,* 895 F.2d 123 (3rd Cir.1990) (modification of mortgag-

---

**10.** Section 101(5) provides:

"Claim" means—
    (a) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

    (b) right to an equitable remedy for breach of performance is such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured[.]

11 U.S.C. § 101(5).

ee's claim was permissible where residential mortgagee was secured by "additional collateral" in appliances, machinery, furniture, and equipment).

While the *Nobelman* decision unquestionably prohibits a Chapter 13 debtor from relying on 11 U.S.C. § 506(a) to "strip down" a mortgagee's lien to the value of the mortgaged premises *that is the debtor's principal residence,* the Supreme Court never specifically addressed the issue of when a claim is considered to be secured *"only* by an interest in real property that is the debtor's principal residence." *See* 11 U.S.C. § 1322(b)(2) (emphasis supplied). In the *Nobelman* case itself, the deed of trust securing the debtor's premises also provided a security interest in "an undivided .67% interest in the common areas of the condominium complex, escrow funds, proceeds of hazard insurance, and rents." *See Nobelman v. American Savings Bank (In re Nobelman),* 129 B.R. 98, 99 (N.D.Tex.1991), *aff'd,* 968 F.2d 483 (5th Cir. 1992), *aff'd,* —— U.S. ——, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993). The effect of this "additional" security interest was never discussed by the Supreme Court.

A technical reading of § 1322(b)(2) might suggest that Congress intended to strictly limit the protection of claims that would fall under the statute. On the other hand, an expansive reading of *Nobelman* would suggest that the failure of the Supreme Court to address the so-called boilerplate interests constitutes an acknowledgement that such interests are merely incidental to the real property interest being protected. *See Citicorp Mortgage, Inc., v. Hirsch (In re Hirsch),* 166 B.R. 248, 253 (E.D.Pa.1994) ("[W]e find that *Nobelman* necessarily resolved the issue of whether the Nobelman's deed of trust fell within the purview of

§ 1322(b)(2)).[11] One commentator has aptly stated:

> The "boilerplate" case law is hopelessly irreconcilable because Congress did not contemplate that the intensely technological language of mortgage instruments would be tested against the simple but precise language of § 1322(b)(2). Without congressional action, after *Nobelman* there is every incentive for debtors to microscopically parse the language of every mortgage instrument in search of errant appurtenances, hereditaments, and other morsels of unreal collateral in hopes of upsetting the sanctity of the "rights" protected from modification by § 1322(b)(2). No peace will come to this area of law until Congress clarifies the statute.

K. Lundin, CHAPTER 13 BANKRUPTCY, § 4.44 (1994).

Without the benefit of a finely-tuned statute or a clear mandate from the Supreme Court, several post-*Nobelman* decisions have ruled that the inclusion of additional collateral, similar to the Appurtenances set forth in the June Mortgage, does not affect the anti-modification provisions of § 1322(b)(2). *E.g. In re Halperin,* 170 B.R. 500 (Bankr.D.Conn. 1994) (residential mortgagee's security interest which extended to rents, royalties, oil and gas rights, profits, stock and fixtures did not remove mortgage from protection of § 1322(b)(2)); *In re Harris,* 167 B.R. 813 (Bankr.D.S.C.1994) (residential mortgage also covering rents and fixtures did not exclude mortgagee from protection of § 1322(b)(2)); *Miami Valley Bank v. Lutz (In re Lutz),* 164 B.R. 239 (Bankr.W.D.Pa. 1994) (residential mortgage granting bank security interest in rents, issues, and profits did not extend bank's security interest beyond interest in debtor's residence so as to

---

11. Some post-*Nobelman* decisions would disagree with such a reading of *Nobelman.* For example in the bankruptcy court's decision in *Hirsch v. Citicorp. Mortgage Corp. (In re Hirsch),* Judge Scholl stated "[Nobelman] did not hold that a 'strip down' of a mortgagee's lien was not permissible in a Chapter 13 case." 155 B.R. 688, 689 (Bankr.E.D.Pa.1993), *vacated,* 166 B.R. 248 (E.D.Pa.1994). The *Hirsch* Court also commented that the Supreme Court did not address the effect of the "additional" security "because

the *Nobelman* debtor apparently assumed or conceded that the mortgage in issue was within the scope of § 1322(b)(2)." *Id.* at 690. *See also Hammond v. Commonwealth Mortgage Corp. (In re Hammond),* 27 F.3d 52, 57 (3rd Cir.1994) ("[T]he Supreme Court's failure to address the effect of the additional security interest in the Nobelman mortgage does not imply that the Supreme Court held that section 1322(b)(2) prohibits bifurcation of residential mortgages that also give the mortgagee a lien on personal property used in or about the residence.").

permit strip down); *In re Spano,* 161 B.R. 880 (Bankr.D.Conn.1993) (mortgagee's interest in rents, fixtures and hazard insurance proceeds did not remove mortgagee from § 1322(b)(2)'s protection against modification); *In re Hirsch,* 166 B.R. 248 (district court held (1) security interest in royalties, mineral, oil and gas rights, water rights, fixtures was not additional security for § 1322(b)(2) purposes; and (2) additional security interest in furniture and other personal property did not deprive mortgagee of protection from modification).

A number of courts, most notably out of the Third Circuit, have reached a contrary result. *In re Hammond,* 27 F.3d 52 (mortgage that created security interest in debtor's personal property in addition to lien on debtor's principal residence could be bifurcated); *Johns v. Rousseau Mortgage Corp. (In re Johns),* 165 B.R. 405 (E.D.Pa.1994), *aff'd,* 37 F.3d 1021 (3rd Cir.1994) (Chapter 13 plan could modify residential mortgagee's rights where mortgagee's interest was secured by other collateral including "alterations, additions, improvements, appliances, machinery, furniture and equipment"); *Hutchins v. Commonwealth Mortgage Corp.,* 165 B.R. 401 (E.D.Pa.1994) (district court affirmed bankruptcy court's decision to allow bifurcation of residential mortgagee's claim secured also by appliances, machinery, furniture and equipment); *Peoples First National Bank v. Haraschak (In re Haraschak),* 169 B.R. 325 (Bankr.M.D.Pa.1994) (residential mortgage secured by all improvements, fixtures, appliances, and equipment was excluded from protection of § 1322(b)(2)); *Third National Bank & Trust Co. v. Tallo (In re Tallo),* 168 B.R. 573 (Bankr.M.D.Pa.1994) (additional security in "rents, issues and profits" removed mortgagee's protection against modification of claims secured only be debtor's residence).

In *Hammond,* the Third Circuit held that "*Nobelman* [did] not overrule [the] holding in *Wilson* or *Sapos* that a mortgagee who wishes to avoid bifurcation of its claim on a residential mortgage must limit its lien to the real estate" and ruled that it was "bound by the alternate holding of *Sapos* and *Wilson,*

which the Supreme Court did not consider in *Nobelman.*" 27 F.3d at 57.

The *Wilson* court, in considering whether the mortgagee's interest in machinery, furniture, and equipment was "additional" security for § 1322(b)(2) purposes, emphasized that those items were personal property and "patently items of independent collateral." 895 F.2d at 129. The *Sapos* decision, which adopted the teachings of *Wilson,* also agreed that banks and mortgage companies which use printed forms to reach collateral that is personalty and not realty may not seek the protection of § 1322(b)(2). 967 F.2d at 925.

While *Hammond, Wilson* and *Sapos* view such boilerplate interests as personalty of independent value, this Court agrees with the *Davis* court that such collateral are "benefits which are merely incidental to an interest in real property." *See Davis,* 989 F.2d at 212. The Sixth Circuit in *Davis* determined that a mortgagee's interest in "hereditaments and appurtenances, rents, royalties, profits, and fixtures thereto appertaining" did not move the mortgagee's claim outside of § 1322(b)(2) because such items were "inextricably bound to the real property itself as part of the possessory bundle of rights." *Id.* at 213. Similarly, in the *Spano* decision, the Connecticut bankruptcy court stated that "the fact that the ... mortgage may have used many words to describe component parts of the real property when the words 'real property' may have sufficed, does not mean that the [lender] has a security interest in something other than the 'real property that is the debtor's principal residence.'" 161 B.R. at 884. The *Spano* court looked to state law to determine whether each item of the lender's collateral was included within the phrase "real property". *Id. Cf. In re Lutz,* 164 B.R. 239 (Bankr.W.D.Pa.1994) (Pennsylvania law applied to determine whether "improvements and fixtures," "additions or improvements," and "rents, issues and profits" constituted security interest in something other than real estate which was the debtor's real estate for purposes of § 1322(B)(2)).

This Court is not inclined to confine its holding by reliance on definitions of real property under applicable state law. Wheth-

er a mortgage enjoys a perfected security interest in an asset is an issue which should be determined pursuant to state law. However, whether the attempted inclusion of that asset in a mortgage instrument is sufficient to deny a lender the protection of the anti-modification provisions of § 1322(b)(2) is an issue of federal bankruptcy law. In order to properly analyze the effect of "additional collateral" on the anti-modification provisions of § 1322(b)(2), this Court believes that the test should be whether or not the "additional collateral" set forth in the subject mortgage is nothing more than an enhancement which is or can, by agreement of the parties, be made a component part of the real property or is of little or no independent value. The existence of collateral which is nothing more than such an enhancement should not result in a forfeiture by the lender of the anti-modification provisions of § 1322(b)(2). This interpretation of § 1322(b)(2) more closely coincides with Congress' intent to "encourage the flow of capital into the home lending market," *Nobelman*, — U.S. at —, 113 S.Ct. at 2112, and to protect "rights" which are bargained for between the mortgagor and mortgagee as "reflected in the relevant mortgage instruments, which are enforceable under [state] law." *Id.* at —, 113 S.Ct. at 2110.

In the case at bar, the subject language of the June Mortgage appears to limit the Appurtenances to enhancements which are fixtures or personalty that is or can be made a component part of the real property.[12] Therefore, the Appurtenances do not constitute the type of "additional security" that would deprive the G.L.B. claim from the protection of § 1322(b)(2).

### (b) *The Deposits*

■ The June Mortgage's inclusion of a security interest in "deposits" should not result in a forfeiture of the anti-modification provisions of § 1322(b)(2) because no such deposits existed at the time of case commencement. *In re Boisvert*, 156 B.R. 357 (Bankr.D.Mass.1993). In the *Boisvert* case, Judge Feeney ruled that § 1322(b)(2) prohibited a Chapter 13 debtor from modifying a mortgagee's claim which was secured only by the debtor's principal residence on the date of the filing, despite the fact that the claim was secured by other properties at the time of loan origination. Relying on the language of § 1322(b)(2) and 11 U.S.C. § 502(b) (which provides that "the court ... shall determine the amount of [a] claim ... as of the date of the filing of the petition"), Judge Feeney determined that the crucial or relevant time to evaluate the extent of a creditor's collateral is as of the commencement of the case. 156 B.R. at 358. *See In re Wetherbee*, 164 B.R. 212 (Bankr.D.N.H.1994) (plain language of § 1322(b)(2) did not prohibit the debtor from modifying the mortgagee's claim which was secured by the debtor's residence and rental property on the date of the filing).

The parties have stipulated that there were no "deposits" held by G.L.B. at the commencement of the case. Accordingly, this Court follows *In re Boisvert* and finds that the June Mortgage's inclusion of a security interest in "deposits" is immaterial for the purposes of § 1322(b)(2).

### (3) *Modification of a Matured Obligation Under § 1322(b)(3)*

■ The third issue before the Court concerns whether or not a debtor may restructure a matured obligation through a Chapter 13 plan pursuant to § 1322(b)(3). This issue has also been visited by Judge Feeney in the decision of *In re Baxter*, 155 B.R. 285 (Bankr.D.Mass.1993). In *Baxter*, the Court considered whether a Chapter 13 debtor could rely on §§ 1322(b)(3) and (5) [13]

---

12. There is included herein as part of the realty all portable or sectional buildings at any time placed upon said premises, and all furnaces, ranges, heaters, plumbing, gas and electric fixtures, screens, mantels, shades, screen doors, storm doors and windows, oil burners, gas or electric refrigerators *and all other fixtures* of whatever kind and nature at present or hereafter installed in or on the granted premises in any manner which renders such articles usable in connection therewith *so far as the same are or can by agreement of parties, be made a part of the realty, and all material apparatus or supplies intended to entered into the construction, repair or remodeling* of the buildings on said premises, or placed therein or thereon prior to the full payment and discharge of the mortgage. (emphasis supplied).

13. Section 1322(b)(5) provides:

to cure an unaccelerated residential mortgage that had matured by its own terms prior to the commencement of the case. The Court determined that the definition of "cure" under §§ 1322(b)(3) and (5) necessarily required the restoration of the parties' relationship to the status quo ante. The imposition of a revised payment schedule would clearly constitute a modification under § 1322(b)(2). Therefore, Judge Feeney concluded that the application of *Nobelman* "preclud[ed] the [d]ebtor from altering [the mortgagee's] rights by rewriting the terms of a fully matured home mortgage." *Id.* at 257; *see also In re Pruitte,* 157 B.R. 662 (Bankr. E.D.Mo.1993); *In re Manocchia,* 157 B.R. 45 (Bankr.D.R.I.1993).

In this case, "curing" the matured obligation to G.L.B. would require reinstatement of the original payment terms of the debt. The Debtors' plan proposes a new payment schedule on that debt. Such a new payment schedule constitutes a modification and not a cure. For the reasons set forth above, a modification of the G.L.B. claim is prohibited by § 1322(b)(2).

## C. *Conclusion*

The Court hereby denies confirmation of the Debtor's Plan and sustains G.L.B.'s objection thereto. Debtor's alternative request to convert to Chapter 11 proceedings is granted. A separate Order will issue consistent with this Memorandum of Decision.

Subject to subsections (a) and (c) of this section, the plan may— ...
> (5) notwithstanding paragraph (2) of this subsection, provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due[.]

11 U.S.C. § 1322(b)(2).