**In re Afonso DaCOSTA and Mbiyavanga M. DaCosta, Debtors.**

**Bankruptcy No. 96–12075–JNF.**

United States Bankruptcy Court, D. Massachusetts.

Nov. 19, 1996.

Liam J. Vesely, Aloisi & Aloisi, Boston, MA, for Haymarket Cooperative Bank.

Tracey A.L. Ingle, McKenzie & Edwards, P.C., Boston, MA, for Debtors.

Richard Askenase, Chapter 13 Trustee, Boston, MA, for Ch. 13 Trustee.

## MEMORANDUM

JOAN N. FEENEY, Bankruptcy Judge.

### I. INTRODUCTION

Two motions are before the Court for determination: 1) the Debtors' "Motion to Modify the Secured Claim of Haymarket Cooperative Bank;" and 2) the Debtors' "Motion for Determination." Through their motions, Afonso and Mbiyavanga DaCosta (the "Debtors") seek a determination that they can modify the secured claim of Haymarket Cooperative Bank (the "Bank") pursuant to 11 U.S.C. § 1322(b)(2) [1] and that the Bank has a secured claim in the amount of $90,000.00 and an unsecured claim in the amount of $53,414.00. *See* 11 U.S.C. 506(a).[2] The Bank

---

1. Section 1322(b)(2) provides in relevant part the following:

    (b) Subject to subsections (a) and (c) of this section, the plan may—

    (2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims....

11 U.S.C. § 1322(b)(2).

2. Section 506(a) provides in relevant part the following:

    (a) An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property ... and is an

filed a single objection to both motions. The Court heard the matter on June 13, 1996. On July 25, 1996, the Court issued a pretrial order with respect to the contested matters. On September 27, 1996, the parties filed a Joint Pretrial Memorandum in which they agreed that there were no contested issues of fact. Accordingly, on October 1, 1996, the Court ordered the parties to file briefs within 30 days. Upon consideration of the undisputed facts and the briefs submitted by the parties, the Court makes the following findings of fact and rulings of law in accordance with Fed.R.Bankr.P. 7052.

## II. FACTS

The Debtors filed a voluntary petition under Chapter 7 on March 25, 1996. The Chapter 7 Trustee filed a Report of No Distribution on April 26, 1996. Prior to the deadline for filing complaints under 11 U.S.C. §§ 523 and 727, the Debtors filed a motion to convert their Chapter 7 case to a case under Chapter 13, along with the Motion to Modify and the Motion to Determine. The Debtors also filed a Chapter 13 Plan and Amended Schedules A, I and J.[3] The Court granted the Debtors' motion to convert on June 13, 1996 and ordered the Debtors to file an Amended Chapter 13 Plan.

In their Joint Pretrial Memorandum, the parties agreed that, on April 10, 1989, the Debtors executed a Promissory Note to the Bank in the principal amount of $148,000.00 secured by a first mortgage on residential property located at 45 Bloomfield Street, Dorchester, Massachusetts (the "property"). The parties also agreed that, as of July 24, 1996, the fair market value of the property located at 45 Bloomfield Street was $110,-000.00. On or about July 10, 1996, the Bank filed a proof of claim in the amount of $149,-228.71, including $6,860.84 in prepetition arrearages. As of the petition date, March 25, 1996, the Debtors' arrearages to the Bank were comprised of $1,062.24 in principal,

$4,171.36 in interest, $156.95 in late charges, $50.00 in appraisal/inspection fees, $1,037.00 in legal fees, and $383.29 in legal costs. The parties agree that the Bank has a total claim of $149,228.71. However, they dispute whether the Bank has a fully secured claim in the amount of $149,228.71 or whether it has a secured claim in the amount of $110,-000.00 and an unsecured claim in the amount of $39,228.71.

Beginning on May 10, 1989, the Debtors made monthly payments of interest only. Beginning on September 10, 1994, the Debtors made payments which included amounts to be applied toward the principal balance of the loan obligation. The Note provided for an interest rate consistent with the "Wall Street Prime" rate listed in the *Wall Street Journal*. The initial rate was 11.5%. The rate was adjusted every six months in accordance with the Wall Street Prime rate, but was capped at 18%. The Note also provided that, for the first five years of the term of the loan, interest only would be payable monthly in arrears commencing on May 10, 1989 and on the tenth day of each succeeding month. Beginning with the payment due on May 10, 1994, payments were to be calculated based upon the then current interest rate, amortized over the remaining term of the Note. Payments of interest and principal would then be payable in arrears.

The property located at 45 Bloomfield Street is a two-family dwelling, comprised of a first floor unit, a second floor unit and an attic. The Debtors have continuously occupied the property along with seven of their children as their principal residence from the date of acquisition in April of 1989 to the present. They have never rented any part of the property to anyone. Prior to the Debtors' bankruptcy filing and through the present, the Debtors' son, Zola, age 28, from time to time has given money in varying amounts to the Debtors when it was requested of him. The Debtors do not consider this money to

unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim.
11 U.S.C. § 506(a).

**3.** On Amended Schedule I, the Debtors listed 12 dependent children, only four of whom were

under 21 years of age on May 15, 1996. The Debtors also reported "other monthly income" of $600.00 from two of their children ($300.00 per month apiece). On Schedule J, they reported total monthly excess income of $295.00.

be rent. Rather, they consider it to be a contribution toward household expenses. Beginning in July of 1996, the Debtors began receiving contributions of $200.00 per month from another son, Robert, age 24, which they do not consider rental income.[4] The Debtors pay for all utilities for the property, including electricity, gas, heat and telephone. The Debtors live in the second floor unit, along with several of their children. Zola lives in the first floor unit along with at least one, and occasionally two, siblings. Robert lives in the attic space, along with another sibling. Several of the children use the first floor, second floor and attic interchangeably as living space. The Debtors and their children have free access to and use of the entire house, although they usually congregate on the second floor for family functions.

The key to resolving the dispute between the parties involves interpretation of the terms of the mortgage executed by the Debtors. The mortgage contains the following pertinent provisions:

> We, Afonso–Bey DaCosta and Mbiyavanga Madeleine DaCosta, husband and wife as tenants by the entirety, ... for consideration paid, grant to ... [the Bank] ..., with MORTGAGE COVENANTS to secure the payment of interest and any other charges thereon, payable as provided in a certain note ... of even date, and also to secure the performance of all covenants and agreements herein contained, on certain property located at 45 BLOOMFIELD STREET, DORCHESTER, SUFFOLK COUNTY, MASSACHUSETTS, together with any improvements now or hereafter situated thereon all as described in Schedule A annexed by reference as if fully set out herein.
>
> ALSO all of the articles, fixtures and equipment now or hereafter situate on the above-described premises or used therewith.
>
> THE Mortgagor covenants and agrees that, as of the execution hereof and upon the subsequent acquisition of such articles, fixtures and equipment now or hereafter

used *in the operation of the realty hereby conveyed,* the Mortgagor shall:

(A) *provide the holder with a precise inventory* of the same, as and when provided;

(B) execute and deliver to the holder, in the form appropriate for recording and filing, a first security agreement and financing statements on all such articles, fixtures and equipment;

(C) provide to holder such other assurances as may be required by the holder to establish the holder's first and prior security interest in such articles, fixtures and equipment; and

(D) execute, deliver and cause to be recorded and filed from time to time, without notice or demand, and at the Mortgagor's sole cost and expense, continuances and such other instruments as will maintain the holder's priority of security in such articles, fixtures and equipment.

THE above-described realty, *articles, fixtures and equipment,* together with any and all improvements now thereon, or from time to time thereon, and any additions thereto and replacements thereof, are herein collectively referred to as the "Property".

The Mortgagor covenants: ...

8. not to lease the Property or any substantial part thereof, except for actual occupancy; otherwise faithfully to keep and observe and satisfy all the obligations on the part of the lessor to be kept, performed and satisfied under every lease from time to time in force with reference to the Property, and not to alter or terminate any such lease; and, at any time on notice from the holder, to submit to the holder for examination all such leases and, *on the demand of the holder, to assign and deliver to the holder any or all such leases, or the rents and profits thereof, such assignments to be in form satisfactory to the holder,* but in all events to provide that the Mortgagor shall retain the rents and profits thereof until a default occurs in any covenant or condition in this Mortgage;

---

4. The Court notes the discrepancy between these agreed facts and the Debtors' Amended

Schedule I.

and the holder shall have the right, by the execution of suitable written instruments from time to time, to subordinate this mortgage, and the rights of the holder hereunder, to any lease or leases from time to time in force with reference to the Property, and, on the execution of any such instrument, this Mortgage shall be subordinate to the lease for which such subordination is applicable with the same force and effect as if such leases had been executed and delivered prior to the execution and delivery and recording of this Mortgage. . . .

IN the event that there is a default under the terms of the Note or under the terms of this Mortgage Deed, *Mortgagee shall have the right to notify all tenants in the mortgaged premises that the loan is currently in default and that all rental payments are to be paid to Mortgagee until such time as the default is cured or the obligation hereunder are otherwise dispose of by operation of law.*

(emphasis supplied).

## III. DISCUSSION

In *Lomas Mortgage, Inc. v. Louis,* 82 F.3d 1, 7 (1st Cir.1996), the United States Court of Appeals for the First Circuit held that "the antimodification provision of § 1322(b)(2) does not bar modification of a secured claim on a multi-unit property in which one of the units is the debtor's principal residence and the security interest extends to the other income-producing units." In the instant case, the first floor rental unit in the Debtors' residence is not income-producing. Rather, it has the potential to be income-producing. Accordingly, this Court could distinguish *Louis* on this ground and apply the test articulated by Judge Boroff in *In re French,* 174 B.R. 1, 7 (Bankr.D.Mass.1994).

In *French,* the court examined the issue of what "additional collateral" removes a mortgagee's claim from protection against modification under section 1322(b)(2). *See also In re PNC Mortgage Company v. Dicks (In re*

*Dicks),* 199 B.R. 674 n. 3 (N.D.Ind.1996). The *French* court stated the following:

This Court is not inclined to confine its holding by reliance on definitions of real property under applicable state law. Whether a mortgage [sic] enjoys a perfected security interest in an asset is an issue which should be determined pursuant to state law. However, whether the attempted inclusion of that asset in a mortgage instrument is sufficient to deny a lender the protection of the anti-modification provisions of § 1322(b)(2) is an issue of federal bankruptcy law. In order to properly analyze the effect of "additional collateral" on the anti-modification provisions of § 1322(b)(2), this Court believes that the test should be whether or not the "additional collateral" set forth in the subject mortgage is nothing more than an enhancement which is or can, by agreement of the parties, be made a component part of the real property or is of little or no independent value.

174 B.R. at 6–7. Applying the test articulated by the court in *French,* the Court finds that the Debtors may modify the Bank's claim.

■ The Court finds that the assignment of rents for the potentially income producing unit in the Debtors' residence is additional collateral that has independent value. Moreover, the Note and mortgage executed by the DaCostas was not a standard FNMA form for a single-family dwelling. Rather, they contain the indicia of a commercial loan: The interest rate is tied to the so-called "Wall Street Prime" rate and interest only was payable for the first five years of the 25 year term of the Note. The mortgage refers to "the operation of the realty," and contains numerous references to "additional collateral," including articles, fixtures and equipment, which was to be precisely inventoried by the Debtors, as well as an assignment of rents. Accordingly, the Court finds that the Debtors may modify the Bank's claim under § 1322(b)(2).[5]

5. The Court notes that under § 1325(a)(3) the Court, in order to confirm the Debtors' Plan, must find that it has been proposed "in good faith and not by any means forbidden by law."

11 U.S.C. § 1325(a)(3). The Court cannot ignore that the Debtors have benefitted by avoiding the antimodification provision of § 1322(b)(2) under the provisions of their Note and mortgage which

■ The Debtors also argue that the portion of the secured claim which is attributable to prepetition principal, $1,062.24, and which will be paid through the Plan along with the other components of the arrearage, should be excluded from the principal balance for purposes of amortizing the Note and calculating the Debtors' monthly payments pursuant to 11 U.S.C. § 1322(b)(5).[6] In other words, the Debtors claim that the principal balance should be $108,937.76. Recognizing the potential for "double accounting," a leading commentator states the following:

> One way to avoid the double accounting problem is to allocate the principal portion of each payment on the arrearage as a reduction in the principal amount of the allowed secured claim that remains to be paid by the debtor. Another way to avoid double recovery of the principal portion of the arrearage would be to reduce the allowed amount of the secured claim by the principal portion of the arrearages with each payment under the plan.

1 Keith M. Lundin, *Chapter 13 Bankruptcy*, § 4.46, 4–64 (John Wiley & Sons, Inc. 2d ed. 1994 & Supp.).

The Debtors also argue that if the Bank is allowed to calculate the payments due based on the entire principal balance, both secured and unsecured, "it will ultimately recover interest over and above what it is entitled to recover, namely interest on the principal portion of the unsecured claim." The Court finds that the Debtors are attempting to do what this Court proscribed in *In re Murphy*, 175 B.R. 134 (Bankr.D.Mass.1994), namely to make monthly payments in a sum equal to the new principal amount of the Bank's claim amortized over the life of the plan and beyond, rather than the regular monthly pay-

ment. Accordingly, the Court reiterates its holding in the companion case to Murphy, *In re Brown*, 175 B.R. 129 (Bankr.D.Mass.1994): "[t]he allowed amount of the secured portion of the mortgage claim after claim splitting under § 506(a) remains the maximum amount that the mortgage holder is entitled to recover on account of the payments by the debtor, including the arrearage payments." 175 B.R. at 134 (quoting Lundin, *supra*, at ¶ 4.55, 4–103). In other words, 11 U.S.C. § 1325(a)(5)(B)(ii) protects against the consequences the Debtors foresee. That section provides in relevant part the following:

> (5) with respect to each allowed secured claim provided for by the plan— ...
>
> > (B) the plan provides that the holder of such claim retain the lien securing such claim; and
> >
> > > (ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim....

11 U.S.C. § 1325(a)(5)(B)(ii).

## IV. CONCLUSION

In accordance with the foregoing, the Court hereby grants the Debtors' Motion to Modify the Secured Claim of Haymarket Cooperative Bank and the Debtors' Motion for Determination. The Court rules that Haymarket Cooperative Bank has a secured claim in the amount of $110,000.00 and an unsecured claim in the amount of $39,228.71.

---

contemplate rental income from the "operation of the realty," although the Debtors do not and never have collected rental income from the unit located on the first floor of their home. In view of the magnitude of the unsecured debt, $14,877.49, excluding the Bank's $39,228.71 unsecured claim, the Court finds that, absent rental of the first floor unit at a fair market rental rate, the Debtors' Plan may not satisfy the requirement of § 1325(a)(3).

**6.** Section 1322(b)(5) provides in relevant part the following:

> (b) Subject to subsection (a) and (c) of this section, the plan may—
>
> (5) notwithstanding paragraph (2) of this subsection, provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due.

11 U.S.C. § 1322(b)(5).