**In re Adan RODRIGUEZ a/k/a Adam Rodriguez, Debtor.**

**Adan RODRIGUEZ a/k/a Adam Rodriguez, Plaintiff,**

**v.**

**MELLON BANK, N.A. and Central Credit Fund, Inc. t/a Central Credit Consumer Discount Company and American General Consumer Discount Company, Defendants.**

**Bankruptcy No. 97–10390.**
**Adversary No. 97–0987.**

United States Bankruptcy Court, E.D. Pennsylvania.

March 16, 1998.

David Sambolin, Philadelphia, PA, for Debtor.

Frederick L. Reigle, Reading, PA, Chapter 13 Trustee.

## OPINION

STEPHEN RASLAVICH, Bankruptcy Judge.

The instant adversary proceeding arises out of a disturbing factual scenario in which the defendant, Central Credit Fund, Inc. ("Central"), engaged in the self-help repossession of the debtor's residential real estate. At a time when the debtor was only two months in default on a small second mortgage, Central, without providing any notice whatsoever, locked the Debtor out of his house and assumed control thereof as mortgagee-in-possession. Following a two year ordeal, the debtor was able to regain possession of the house only to find that in the interim it had been substantially damaged while under Central's control. Finally, after finding his way to bankruptcy court, the Debtor filed the present adversary proceeding seeking redress for Central's conduct.

In addition, the Debtor seeks relief against two other secured creditors, Mellon Bank, the holder of a first mortgage on the property, and American General Consumer Discount Company, the holder of a third mortgage on the property. With respect to these defendants, the primary thrust of the debtor's complaint is that the amounts of their allowed secured claims should be reduced or eliminated pursuant to 11 U.S.C. § 506. Secondarily, the Debtor also asserts a variety of claims against these creditors based on alleged violations of the Pennsylvania Act of 1974, No. 6, 41 P.S. § 101 et seq. ("Act 6"), the Federal Truth–in–Lending Act, 15 U.S.C. §§ 1601–1667e, the Federal Fair Debt Collection Practices Act, 15 U.S.C. § 1691e(11), and the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201–1 et seq. (which because it regulates unfair or deceptive acts and practices is commonly referred to as "UDAP").

## BACKGROUND

Adan Rodriguez, the Debtor, filed a voluntary petition for relief under Chapter 13 of the Bankruptcy Code on July 7, 1997. Thereafter, on September 12, 1997, he filed a complaint to initiate the above captioned adversary proceeding. Pursuant to court order, on January 22, 1998, the parties filed a joint pre-trial statement. According to this statement, the Debtor's claims against American were settled and are no longer at issue. As the holder of a completely undersecured third mortgage on the Debtor's home, American agreed that its lien could be avoided. The proceeding came to trial on January 28, 1998, with additional hearing time given to the matter on January 30, on which day the trial was completed.

With respect to Mellon Bank, there were virtually no factual disputes. The parties agreed to the admission of an appraisal in which the Debtor's house was valued at $16,500 and to the admission of all pertinent documentation related to the loan, mortgage and foreclosure proceedings. Thus, while Mellon was represented at the trial, its par-

ticipation was minimal. Most of the evidence was presented in relationship to the Debtor's claims against Central.

Including the Debtor, four witnesses testified in his case-in-chief. The first was a woman named Elizabeth Gonzalez who indicated that she has been living with the Debtor as his significant other since November 1996. Also testifying was the Debtor's sister, Maria Alvarez, and brother-in-law, Ramon Alvarez. The testimony of these individuals establishes the events chronicled hereafter.

In 1991, while the Debtor was married to a woman named Iris Rodriguez, he and his wife purchased a modest house in the Hunting Park section of the City of Philadelphia located at 643 W. Lycoming Avenue. The property was a two story row home with three bedrooms and one bathroom. The acquisition of the property was financed with a purchase money mortgage in the amount of $23,650 provided by Mellon Bank, N.A. The financing was evidenced by a mortgage and note dated September 12, 1991, signed by the Debtor and his wife. How much money, if any, the Debtor tendered as a down payment for the property is unknown. The Debtor indicated that he had last been employed in the construction field in 1991, and, thus he may have been employed at the time of the purchase. Soon thereafter, however, the Debtor became disabled and was no longer able to work. Information about the Debtor's disability is sketchy but it is known that he had some sort of operation on his abdomen during or about the year 1991 and that the operation was deemed a failure. Ever since then the Debtor has been highly medicated on a regular basis. The Debtor also had admitted into evidence a medical assessment form on which a doctor assessed the Debtor's ability to partake in employment. According to this form, the Debtor has been in treatment since 1993 for depression and psychosis and is susceptible to auditory and visual hallucinations.

The Debtor is of Puerto Rican origin, making Spanish his native language. Although he may be able to understand a few rudimentary words in English, he does not speak English. He speaks and conducts his affairs in Spanish. He deals with the English speaking world of the mainland United States through his wife and family members who translate and/or conduct his business for him. Throughout his life he often relied upon his sister Maria, who does speak English, to help him deal with government and private agencies and businesses.

Despite his condition, the Debtor does not receive any form of public assistance. The Debtor and his wife have children; however, and the wife received public assistance. Using that income, the Debtor and his wife were able to make the payment on the Mellon Bank mortgage which amounted to about $225 per month.

At the time of purchase, the house was not purported to be in the best condition. Over the next several years, however, the witnesses testified that the Debtor slowly remodeled the property step-by-step until it came to be in nearly perfect condition. As part of the remodeling, the Debtor had new windows installed in the house. The windows were installed in 1993 by Allstate Discount Builders for a cash sale price of $2,995. Financing for this work was provided by the defendant Central Credit Fund, Inc., which took assignment of an installment sales contract between the Debtor and Allstate dated July 23, 1993. The total sale price under the contract including interest and fees over a 42 month amortization period was $3,950.52. The debt was secured by a mortgage on the Debtor's property at 643 W. Lycoming Street which was also assigned to Central with the installment sales contract. Central's role as assignee of the contract and mortgage was anticipated from the inception of the transaction, and Central had pre-approved the Debtor and his wife for credit prior to the execution thereof. Being that the Debtor himself had no income, payment to Central was predicated upon the wife's public assistance benefits. The monthly payment amount under the contract was $94.06. Payments were due on the tenth of the month beginning in September, 1993, and a 5% late charge would accrue on payments that were not received within 10 days of the due date.

Payments were made for the next year until September 1994. Just prior to Septem-

ber, marital problems between the Debtor and his wife came to a head and the Debtor's wife left him and moved to Lancaster. This turn of events left the Debtor alone and without income, and, as a consequence, he was unable to make payment on either the first or second mortgage. The Debtor missed the September and October payments to Central.

The Debtor and all of his witnesses testified that he continued to reside at the Lycoming Street property through September and October of 1994. Although the Debtor would occasionally stay for a night at his mother's house, he otherwise resided at the Lycoming Street house, which is where he kept all of his possessions, including his furniture, clothing and pet birds. During the month of October, prior to being locked out of his house, the Debtor testified that had spent a total of two nights at his mother's house.

The events underlying the Debtor's claims against Central began on or about October 19 when the Debtor returned to his house from a visit with his mother to find that he had been locked out. Thereupon, he went to his sister's house so that she could attempt to determine what happened. His sister first called Mellon Bank and was informed that the bank had done nothing. She then called Central Credit where she spoke to a person named Ms. Jenkins who explained to her that Central had changed the locks and taken over the property. Over the next several days, she proceeded to have several conversations with people at Central Credit who told her that Central had acted on account of the Debtor's default under the second mortgage and that because of the debt Central did not need the Debtor's permission to take over the property. Ms. Jenkins explained that Central was going to rent the property to a tenant of its own and use the rental proceeds to keep the first mortgage current and repay the debt on the second mortgage.

Maria testified that she specifically inquired about whether the Debtor could have the property back if he paid the second mortgage up to date. Ms. Jenkins's response, however, was that he could not. Since the Debtor no longer had income to use to pay the mortgage on an ongoing basis Central would not allow him regain possession of the premises merely by curing the default. At one point, Jenkins was also said to have stated that Central could not return the property because it had already obtained a tenant to whom to rent the house.

The Debtor was able to make arrangements with Central to remove his property. On the morning of October 28, Central allowed the Debtor and his brother-in-law, Ramon Alvarez, to enter the house and remove his furniture and personal effects. According to the Debtor it was his understanding that if he did not remove his personal property from the premises Central would have sold it at a sheriff's sale. The Debtor and Ramon were let into the property by an employee of Central named Joseph Hemighaus, and while they were there, they were also met by Thomas McDonald, the President of Central. McDonald brought to the house a consent form for the Debtor to sign indicating he was leaving the property. The form, drafted as a letter, stated:

Dear Gentleman:

Please be advised that Adam and Iris Rodriguez have vacated their property located at 643 W. Lycoming Street, Philadelphia. Also note that all personal belongings will be removed from the premises, and we authorize Central Credit Fund, Inc. to take the property over as Mortgagee-in-Possession.

Exhibit D–6, letter to Central Credit dated October 28, 1994. McDonald requested the Debtor to sign the letter stating that Central was going to rent the property to a tenant in order to get his debt repaid, and when the debt was paid Central would return the house to the Debtor. McDonald explained this to Ramon who supposedly explained it to the Debtor. Neither Ramon nor the Debtor could read English well enough to understand the letter, but they nevertheless signed it on the request of McDonald. Ramon stated to McDonald that he wanted to pay the arrears on the loan to have the house returned right away. McDonald, however, refused this request, stating that Central already had a tenant to take up residence in the house.

Central Credit did thereafter enter into a lease for the premises with a woman named Cynthia Braxton. Braxton signed a written lease dated November 5, 1994, for a year's term in the property at a monthly rental rate of $450. The rent was paid to Central who used the funds to pay the first mortgage and then kept the rest for itself.

The next contact between the Debtor and Central occurred a year or so later, most likely in December 1995. At this time, the Debtor, acting through Maria, made an appointment to go to Central Credit and meet with McDonald to discuss the return of the property. The Debtor was prepared to repay the full amount of the loan to obtain the return of the property, and the Debtor testified that he had $2,000 with him to use to make the payment. Central indicated that the remaining debt at that time was about $800. While Central was certainly willing to accept payment, it refused to remove the tenant from the property so that it could deliver the property to the Debtor in a condition ready for his use. Insisting that Central had to remove the tenant from the property, the Debtor withdrew his offer to pay the balance of the loan. Nevertheless, from that point on, Central ceased collecting the rents and otherwise managing the property. Although Central's change of behavior was never adequately explained, it appears that it may have been in response to an inquiry from a lawyer who at about the same time called Central on the Debtor's behalf and spoke to McDonald.

The Debtor attempted to find an attorney to help remove the tenant but was not successful. Another year passed. Finally, in the Fall of 1996, the Debtor heard from neighbors that Braxton vacated the property. By November, the Debtor entered back into the property and discovered that it was vacant. He also discovered that the property had dilapidated to a state of substantial disrepair.

Numerous defective conditions existed in the house including the following: The frame around the front door had been removed and the door could be opened with a push even though it was locked. The entire house was strewn with trash and debris. Evidence of drug use existed, and the basement walls were sprayed with graffiti. The roof leaked. The electricity was not working and the heater was damaged and also not working. Doors were damaged or missing. The electrical wiring in the basement was cut. Certain ceiling lamps were missing. The kitchen was water damaged with a hole in the ceiling and damage to the floor. Water was in the basement and deterioration was evident on the cement walls therein. Ceramic tiles were coming off the bathroom floor, and the board under the floor was weakened and sinking due to water damage. The bathroom needed plumbing repairs and the door was damaged. There were holes in the walls of the rear bedroom and the light switch was exposed. The flooring in the middle bedroom was partially ripped up. The floor surface in the front bedroom was partially torn and missing. The floor surface in the dining area was partially removed. A ceiling light in the living room was removed and the floor surface was partially missing.

The Debtor has since begun repairing the house with a large amount of the work being done by his brother who, among other things, has even fixed the Debtor's leaky roof. Nevertheless, central heating has still not been restored to the house and as of the date of the trial the Debtor is using space heaters. The Debtor has spent $1,300 for repair supplies and has paid his brother only $400 cash for the work. The Debtor submitted into evidence a repair estimate from a remodeling contractor indicating that the house could be restored for a cost of $13,751.97. This estimate primarily addressed restoration of the floors, walls, ceilings and related fixtures throughout the house without including plumbing, heating, electrical or roof repairs.

Two witnesses were presented on behalf of Central Credit, Joseph Hemighaus, who worked as a collections manager during the Fall of 1994 and its president, Thomas McDonald. Hemighaus testified to the facts surrounding the lockout. According to him, after the account became delinquent in September, he tried to call the Rodriguezes but was unsuccessful because the phone was disconnected. He wrote the Rodriguezes a letter to which he did not receive a response.

By mid October, he personally visited the Debtor's house on Lycoming Street, but no one was home. During the visit, he indicated that he observed unopened mail piling up inside the house by peering through a mail slot in the front door. Although the mail only amounted to, in his words, about five business days worth of deliveries, he interpreted its presence to mean that the house was abandoned. He stated that he placed his business card through the slot to indicate that he had been there. A few days later he again visited the house, and no one was home. He testified that he observed the continued buildup of unopened mail through the mail slot and that he even could see his business card among the languishing mail. During this visit he also spoke with a neighbor who stated that the Rodriguezes had separated and Iris moved away. The neighbor stated that she had not seen the Debtor for about two weeks. Although no one was home, on both of the visits the house was apparently secure and in good condition.

Based on the comments of the neighbor, the mail that was allegedly piling up, the disconnected phone, and the absence of anyone at the house during the course of his two visits, Hemighaus concluded that the property was abandoned. After conferring with his superiors at Central Credit, he subsequently ordered the locks to be changed. According to Hemighaus, the locks were changed and the house taken over in order to secure the property against vandalism and damage. The locks were changed during the afternoon of October 19. Thereafter, Hemighaus was present to allow the Debtor back in the house on October 28 to remove his personal belongings.

Hemighaus' credibility was severely damaged during cross examination. After being very specific during his direct testimony about viewing the pile of unopened mail through a mail slot on the front door, he was confronted on cross examination with the fact that there was no mail slot on the door. Rather than defend his testimony to any degree, he responded to this information by back peddling. He immediately changed his story and testified that the mail was piling up between the doors and not through a mail slot. Contrary to the testimony of Maria Alvarez, he also testified that he had a phone conversation with her in which he told her that the Debtor could have the property back if the account was brought current.

Most of the testimony offered by Central came from Thomas McDonald who was on the stand longer than any other witness in the case. He recalled the formation of Central's lending relationship with the Debtor and the history of the account. He indicated that Central acted as mortgagee-in-possession on prior occasions and that it was his experience that properties such as the debtor's, located in decaying neighborhoods, were particularly vulnerable to vandalism and damage when they are abandoned.

The overriding theme of McDonald's testimony was that the Debtor had voluntarily decided to move out of his property because he was no longer able to pay the mortgage. McDonald even testified that the Debtor had told him that he was voluntarily leaving the property for that reason. McDonald stated that Central was acting to secure the property only because the Debtor was moving out and that if the Debtor was not vacating the property, Central never would have changed the locks. In fact, McDonald testified that had the Debtor asked to remain in the premises Central would have immediately restored possession to him. According to McDonald, Central was not making payment of its debt, even to the extent of just curing the default, a condition for the Debtor's continued occupancy of the house. With respect to the consent letter identified above as Exhibit D–6, McDonald stated that he had never before had a borrower sign a letter of that nature, but had the letter drafted especially for Adan Rodriguez to sign in this instance. McDonald stated that the idea of having the Debtor sign such a letter was suggested to him by Hemighaus on the morning of October 28 as Hemighaus was observing the Debtor remove his belongings from the premises. McDonald also confirmed that Central had not sent the Debtor a notice under Act 91, and it also appears that no notice was sent to the Debtor under Act 6.

In his testimony, McDonald verified that Central ceased managing the property after

December, 1995. Based on the parties' meeting that month, upon hearing the Debtor express his desire to have the property returned, Central handed over management of the property to the Debtor, for the Debtor to collect the rent and deal with the tenant on his own. For the most part, he refused the Debtor's request for Central to remove the tenant; except he indicated that Central would only remove the tenant if the Debtor paid additional money to Central as compensation for the eviction. Seemingly, after the meeting in December 1995, Central also appears to have stopped seeking collection of the balance due on the loan; although by this time, the principal on the loan had been repaid using the rent collected from the tenant.

With respect to the condition of the house, McDonald testified that Central never knew of any problems with the tenant. The tenant never made any complaints and Central never took any action to check on the property while in the tenant's possession. After December 1995, McDonald indicated that the property was in the hands of the Debtor and it was no longer the responsibility of Central Credit to take care of the property to any degree.

One peculiar aspect of McDonald's testimony was his insistence that the Debtor spoke in English to him. From his recollection of a meeting with the Debtor and his wife in 1993 when the loan was taken out, to the meetings at the house in October 1994 and at the Office of Central Credit in December 1995, to another meeting at the Debtor's house as recently as January 1997, McDonald testified that he communicated with the Debtor in English. In fact, the assertion that the Debtor is English speaking was a position adopted by Central throughout the trial to the point of questioning the need to use a translator in court. Perhaps McDonald made this assertion to bolster the argument that the Debtor knowingly consented to Central's role as mortgagee-in-possession, but in the absence of any corroborating evidence such self serving testimony is completely lacking in probative force, and indeed is inconsistent with the Court's impression gleaned during the trial.

Following the trial, the parties opted to submit legal memoranda to the Court. At this point, the court has received a brief from each of the parties, and the Debtor has, in addition, submitted a reply brief. In the discussion below, the Court will cover the arguments advanced in the Debtor's brief in the order they are presented. Legal theories asserted in the complaint or pre-trial statement but not argued by the Debtor in his brief are deemed to be waived.

## JURISDICTION

Federal jurisdiction exists for this case under 28 U.S.C. § 1334(b). This is a civil proceeding that arises under and/or arises in or is related to a proceeding under title 11. The parties agree in their pleadings that the Court may treat the matter as a core proceeding.

## DISCUSSION

### I(A).

The Debtor initially advances several arguments against Mellon Bank. The first of these arguments is that the Debtor has the right in this case to avoid Mellon's mortgage lien on his house under 11 U.S.C. § 506 to the extent that it is in excess of the property's value. This argument centers of the Debtor's assertion that the mortgage provides the bank with a security interest in personal property including escrow account funds and fixtures. According to the Debtor these are items of personal property the presence of which removes the mortgage from protection against modification under 11 U.S.C. § 1322(b)(2). Upon considerable analysis, the Court must reject that argument.

### (i).

Using section 506 of the Bankruptcy Code, debtors are permitted to avoid liens on property to the extent the property is worth less than the debt it secures. 11 U.S.C. § 506(a) & (d). This right is enjoyed by debtors in most instances except as otherwise provided in the Code. In the case of residential real estate, section 1322(b)(2), known as the anti-modification clause, curtails the ability of debtor's to modify the rights of creditors

with security interests in such property. Specifically, section 1322(b)(2) provides:

(b) Subject to subsections (a) and (c) of this section, the plan may—

(2) modify the rights of holders of secured claims, *other than a claim secured only by a security interest in real property that is the debtor's principal residence,* or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims.

11 U.S.C. § 1322(b)(2) (emphasis added).

In *Wilson v. Commonwealth Mortgage Corp.,* 895 F.2d 123 (1990), the Third Circuit ruled that section 1322(b)(2) did not always prevent a debtor from avoiding undersecured mortgage liens. The court offered two bases for its ruling. The first was that the term "secured claim" used in the beginning clause of the section had to be defined by reference to section 506 to mean a claim that was already limited by the value of the collateral. *Id.* at 126–27. The second basis was that the mortgage in question did not even come under the protection of the anti-modification clause because it was secured by more than just the debtor's real estate. *Id.* at 129. In that instance, in addition to the debtor's real estate, the mortgage gave the creditor a security interest in personal property including " 'any and all appliances, machinery, furniture and equipment (whether fixtures or not) of any nature whatsoever now or hereafter installed in or upon said premises.' " *Id.* at 124.

In *Nobelman v. American Savings Bank,* 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993), the Supreme Court addressed the scope of the anti-modification clause and held that section 1322(b)(2) prevented debtors from avoiding the undersecured portion of a mortgage lien on real estate. The Supreme court thus overruled the first rationale offered by the Third Circuit in *Wilson* for permitted avoidance. The Supreme Court did not address the second rationale pertaining to the applicability of the anti-modification clause to mortgages containing security interests in property that may not be real estate, and, thus, the second prong in *Wilson* is held to have survived *Nobelman.* Lien avoidance remains permissible, then, even

against the holders of residential mortgages where the mortgage is interpreted to be secured by property in addition to the "real property that is the debtor's principal residence." 11 U.S.C. § 1322(b)(2).

Consequently, debtors seeking lien avoidance have aggressively sought to escape the anti-modification clause by claiming that their mortgages include security interests in personal property in addition to real estate. This litigation, taking place against the backdrop of a vaguely drafted statute, the need to balance the competing policy interests of debtors and creditors, and the highly technical nature of real estate finance law, has produced a body of case law that is in irreconcilable conflict. *PNC Mortgage Company v. Dicks,* 199 B.R. 674, 682 (N.D.Ind.1996).

Here in the Eastern District of Pennsylvania, analysis of the question begins with the decisions of the Third Circuit Court of Appeals, which has issued several opinions touching upon the coverage of 1322(b)(2). *In re Hammond,* 27 F.3d 52 (3d Cir.1994); *In re Johns,* 37 F.3d 1021 (3d Cir.1994); *Sapos v. Provident Institution of Savs.,* 967 F.2d 918 (3d Cir.1992); *Wilson,* 895 F.2d at 123. Each of these cases stands for the proposition that the anti-modification clause is inapplicable to mortgages that take security interests in personal property, and, in most instances, there is no question that the subject property was personal in nature. In *Johns,* 37 F.3d at 1023, the mortgage secured " 'any and all appliances, machinery, furniture and equipment (whether fixtures or not) of any nature whatsoever now or hereafter installed in or upon the premises.' " *Id.* Identical clauses were at issue in *Hammond,* 27 F.3d at 53–53, and *Wilson,* 895 F.2d at 124. If nothing else, the reference to furniture is certainly a reference to personal property. Although appliances, machinery and equipment are also probably personal property, as opposed to being a fixture and thereby becoming part of the real estate, furniture does not generally become a fixture.

The mortgage at issue in *Sapos,* 967 F.2d at 918, took a security interest in, " 'the following household appliances, which are, and shall be deemed to be fixtures and a part

of the realty, and are a portion of the security for the indebtedness herein mentioned, namely, wall to wall carpeting....'" *Id.* at 922. The mortgage also extended to "rents and profits." *Id.* at 925. Based on the inclusion of these items the court stated that the mortgage took a security interests in personal property and thus was not within the protection of the anti-modification clause. This decision introduced a degree of uncertainty within the law, however, because the items of property listed in the mortgage were not clearly within the parameters of personal property under state law. Under state law the right to rents and profits is considered to be part of a fee simple interest in real estate. *In re Lutz,* 164 B.R. 239, 243–44 (Bankr.W.D.Pa.1994), *rev'd on other grounds sub nom., Lutz v. Miami Valley Bank,* 192 B.R. 107 (W.D.Pa.1995). Wall-to-wall carpet is also considered to be a fixture and a part of the real estate. *See id.* Based on the inclusion of these items in the *Sapos* mortgage at least one other court has held that the phrase "rents, issues and profits" is a reference to personal property. *Lutz v. Miami Valley Bank,* 192 B.R. 107 (W.D.Pa. 1995) (holding that court was bound by Sapos irrespective of state law); *see also In re Jones,* 201 B.R. 371, 375–76 (Bankr.D.N.J. 1996) (holding that fixtures are personal property). Other courts, however, have rejected that holding because the referenced items are considered to be part of an interest in real estate. *In re Wilkinson,* 189 B.R. 327, 330–31 & n. 5 (Bankr.E.D.Pa.1995) (rejecting argument that "rents, issues and profits" were personal property under state law); *In re Brown,* 189 B.R. 3 (Bankr. E.D.Pa.1995) (rents not personal property).

█ This Court believes that it is an error to read *Sapos* too broadly on the issue of what constitutes personal property as opposed to real estate within the meaning of section 1322(b)(2). Point in fact, the argument that rents, profits and fixtures are component parts of a fee simple interest in real estate was neither raised nor decided by the Third Circuit in that decision. The court saw that these items were listed in the mortgage as additional forms of collateral and just assumed that they were personal property without analysis of their status under state

law. It is fundamental, however, that property rights are created and defined by state law, *Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979), and, thus, this Court cannot ignore state law in addressing the question. *Sapos* must be read in harmony with *Butner* and not used (or overused) as authority to redefine the nature of state law property interests. Accordingly, the Court does not view *Sapos* to stand for the proposition that a fixture, such as carpeting, is personal property, if that holding would be at odds with state property law. *Contra Jones,* 201 B.R. at 375–76.

The *Wilson* decision also introduced a degree of ambiguity to the case law by quoting a particular passage from Colliers on Bankruptcy. The passage indicated that escrow accounts, rents and insurance proceeds, among other items, constitute personal property the presence of which removes a mortgage from coverage by the anti-modification clause. *See also Hammond,* 27 F.3d at 57. At least one bankruptcy court has felt bound to adhere to the quoted language and relied on it to hold that the presence of a security interest in an escrow account removed a mortgage from protection of the anti-modification clause. *In re Crystian,* 197 B.R. 803, 806 (Bankr.W.D.Pa.1996). The Colliers quote must be recognized as dicta, however, because Third Circuit never ruled on the question of whether an escrow account or insurance proceedings are personal property, and the strength of the quote is further weakened by the fact that the courts are clearly divided on these issues. *Compare e.g., In re Davis,* 989 F.2d 208 (6th Cir.1993) (hazard insurance and fixtures are not additional security); *In re Halperin,* 170 B.R. 500 (Bankr.D.Conn.1994) (fixtures, escrow account, and condemnation award are not additional security); *In re Spano,* 161 B.R. 880 (Bankr.D.Conn.1993) (insurance proceeds and fixtures not additional security) *with Jones,* 201 B.R. at 371 (fixtures and insurance proceeds held to be additional collateral).

The lack of a coherent body of case law leaves the Court to fall back upon principles of statutory construction. The aim of construing any statute is to implement the intent

of Congress. *Philbrook v. Glodgett,* 421 U.S. 707, 713, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975); *Flora v. United States,* 357 U.S. 63, 65, 78 S.Ct. 1079, 1081, 2 L.Ed.2d 1165 (1958). "As in all cases of statutory construction, [the Court's] task is to interpret the words of [the statute] in light of the purposes Congress sought to serve". *Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600, 608, 99 S.Ct. 1905, 1911, 60 L.Ed.2d 508 (1979). "When 'interpreting a statute, [a] court [should] not look merely to a particular clause in which general words may be used, but [should] take in connection with it the whole statute (or statutes on the same subject) and the objects and policy of the law, as indicated by its various provisions, and give to it such a construction as will carry into execution the will of the Legislature....'" *Kokoszka v. Belford,* 417 U.S. 642, 650, 94 S.Ct. 2431, 2436, 41 L.Ed.2d 374 (1974). The Court is mindful, moreover, of the principle that Congress does not intend for its legislation to be meaningless or for it to work an absurd result. *Federal Trade Commission v. Manager, Retail Credit Company,* 515 F.2d 988, 994 (D.C.Cir.1975).

■ Congress placed the anti-modification clause in the Bankruptcy Code to protect the interests of the mortgage lending industry for the purpose of assuring a ready supply of capital for use in home mortgage loans. *Nobelman,* 508 U.S. at 332, 113 S.Ct. at 2111–12 (Stevens, J., concurring); *Grubbs v. Houston First American Savings Association,* 730 F.2d 236, 245–46 (5th Cir.1984). This Court will interpret the anti-modification clause to achieve that objective. Accordingly, the court does not believe that section 1322(b)(2) should be read so narrowly that the presence of common home mortgage features such as security interests in escrow accounts or insurance proceeds results in the removal of a mortgage from protection of the anti-modification clause. These features are in nearly every mortgage and thus to hold otherwise would render section 1322(b)(2) meaningless and defeat Congress' objective.

The court finds guidance in decisions that interpret section 1322(b)(2) by reference to the policy of protecting the rights of home mortgage lenders and that observe appropri-

ate sensitivity for the contours of state property law. The court in *In re Eastwood,* 192 B.R. 96 (Bankr.D.N.J.1996), ruled that a mortgagee who had a security interest in, among other things, rents, profits and fixtures, was within the anti-modification clause. This court analyzed New Jersey property law and found that the particular items the debtor asserted were personal property were in actuality already included in a landowner's property rights. In other words, ownership in fee simple of real estate automatically carried with it a right to the rents, profits and fixtures associated with the land. The court observed that a transference of property would transfer these components of ownership whether or not they were individually itemized. Therefore, the fact that the creditor's mortgage contained an itemization of these property interests was of no significance because the grant of the mortgage included them anyway. Accordingly, the court held that the mortgage was secured by nothing more than the debtor's real estate. *Accord Wilkinson,* 189 B.R. at 327 (reaching the same conclusion under Pennsylvania law); *Brown,* 189 B.R. at 3 (same); *Lutz,* 164 B.R. at 239 (same); *In re Anderson,* 209 B.R. 639, 641 (Bankr.M.D.Pa.1997) (right to rents not separate property interest under Pennsylvania law); *see also Davis,* 989 F.2d at 212 ("[w]e hold that the ... phrase ['hereditaments and appurtenances, rents, royalties, profits, and fixtures'] refers to benefits which are merely incidental to an interest in real property, and find that [the creditor's] interest in these incidental benefits does not constitute additional security"); *In re Spano,* 161 B.R. 880, 884 (Bankr.D.Conn.1993) ("the fact that the ... mortgage may have used many words to describe component parts of the real property when the word 'real property' may have sufficed, does not mean that the [mortgagee] has a security interest in something other than [real property]").

The court in *In re Rosen,* 208 B.R. 345 (D.N.J.1997), held that an escrow account was not additional security. Much like the present case, the mortgage in *Rosen* provided for payment by the debtor into an escrow account to be held by the bank to use for the payment of real estate taxes and casualty insurance. The mortgage stated that the

bank held the funds as additional security for the debt. Initially, the court observed that the escrow was not additional security because under New Jersey law a debtor lost his property interest in money so deposited. The court went on, however, and explained that even if the debtor retained an interest in the funds, they could not constitute separate security in view of their function to protect the mortgage. The escrow account was maintained for the purpose of protecting the mortgagee's interest in the property by paying property taxes that, if not paid, would result in a lien superior to that of the mortgagee's, and by paying for insurance to protect the value of the property in the event of causality. The fund was not maintained because it had an independent value beyond its role of protecting the real property collateral. Viewed from this perspective, the court held that the escrow was inextricably bound to the mortgage, and not a separate component of property taken as security for its own intrinsic worth. *Id.* at 353.

In rendering its decision, the *Rosen* court, in part, drew an analogy from cases holding that a security interest in potential insurance proceeds does not constitute additional security. Although such proceeds alone would clearly be personal property, the courts have viewed them as being part of the secured creditor's interest in the real property because they would only come into existence if the property was damaged. The proceeds thus represented no more than the value of the existing improvements and in that sense were not an item of security in addition to the real estate. *Spano,* 161 B.R. at 890; *see Davis,* 989 F.2d at 211.

The bankruptcy court in *In re French,* 174 B.R. 1 (Bankr.D.Mass.1994), devised a test to guide determinations of whether an item of collateral should be considered separate from a mortgagee's security interest in a debtor's residential real estate. Emphasizing that the interpretation of section 1322(b)(2) was ultimately a matter of federal bankruptcy law, the court stated:

> [T]he test should be whether or not the "additional collateral" set forth in the subject mortgage is nothing more than an enhancement which is or .can, by agree-

ment of the parties, be made a component part of the real property or is of little or no independent value.

*Id.* at 7. The court opined that it was contrary to Congressional intent to allow the existence of this type of collateral to cause a creditor to forfeit protection under the anti-modification clause.

A modified version of the test was adopted and employed by the court in *PNC Mortgage Company v. Dicks,* 199 B.R. 674 (N.D.Ind. 1996). The *Dicks* court cited *French* approvingly and adopted it's test, modified by reading the two elements in the conjunctive rather than the disjunctive. *Dicks* thus held that an item of collateral will not be viewed as being separate from the real estate if it is both (1) an enhancement and (2) has little or no independent value. *Id.* at 682.

■ The Court agrees with the approach illustrated in the foregoing cases and will itself adopt a holistic view of what makes up a security interest in residential real property within the meaning of section 1322(b)(2). The Court will not exclude a mortgage from protection because it separately identifies as an item of security something that is part of the real estate under state law, such as rents and fixtures. Additionally, the Court will not automatically exclude a mortgage from protection due to the existence of a security interest in certain forms of personal property, where the property does not have independent value beyond the maintenance and protection of the collateral. The Court will evaluate the nexus between the real estate and the "additional collateral" and determine whether a separate classification is justified based on the relationship between the two, taking into account the Congressional policy to provide extra protection to the rights of home mortgage lenders.

■ With the above observations in mind, the Court now turns to the debtor's specific arguments pertaining to the Mellon Bank mortgage on the Debtor's property at 643 West Lycoming Street. The Debtor first asserts that the rights Mellon has under paragraph seven of the mortgage constitute additional security. This paragraph autho-

rizes Mellon to defend against defects in the debtor's title or pay off superior liens and add any expenditures incurred into the loan amount to be secured by the Debtor's real estate. The Debtor asserts that the provision, "acts as additional security in the nature of title insurance." Plaintiff's Trial Brief at 3. This argument is clearly wrong. Paragraph seven of the mortgage does not even colorably create any additional form of security for Mellon. Very much to the contrary, it simply allows Mellon to add into its indebtedness any amounts that may be spent to secure clear title to the property. The paragraph then declares that any such amounts will be secured by the existing collateral. The provision does not grant Mellon additional security, but merely allows for the existing security to be encumbered by additional debt. The existence of paragraph seven, then, does not in anyway remove Mellon from the protection of the anti-modification clause.

■ The Debtor next argues the mortgage's reference to fixtures creates a security interest in personal property. In support of this argument the Debtor cites 21 P.S. § 3. This provision of Pennsylvania law defines the bundle of property rights transferred in a real estate transaction as including,

all the estate, right, title, interest, property, claim and demand whatsoever, of the grantor or grantors, in law, equity or otherwise howsoever, of in and to the same, and every part thereof, together with all and singular the improvements, ways, waters, watercourses, rights, liberties, privileges, hereditaments, and appurtenances whatsoever thereto belonging, or in anywise appertaining, and the reversions and remainders, rents, issues and profits thereof.

*Id.* § 3. Since this statute does not expressly include the term "fixtures," the Debtor contends that fixtures are personal as opposed to real property under Pennsylvania law. This argument, however, is incorrect.

■ The statute includes the term "improvements." Fixtures consist of things that attach to an improvement, such as a building, and become a part thereof. *Clayton v. Lien-*

*hard,* 312 Pa. 433, 437–38, 167 A. 321, 322–23 (1933). Accordingly, the reference to improvements in the statute necessarily includes the fixtures that are attached to it. *See id.* Fixtures are, therefore, real property under Pennsylvania law regardless of whether they are expressly listed in 21 P.S. § 3. Because the Court has already concluded above that fixtures constitute real property within the meaning of section 1322(b)(2), the Court rejects the Debtor's argument to the contrary.

■ Finally, the Debtor argues that Mellon's mortgage includes an encumbrance against personal property because it takes a security interest in escrow funds. In conformance with the Court's own expectations of the provisions normally included in a residential mortgage, the Debtor's mortgage requires him to make monthly payments to Mellon in addition to the amount necessary to amortize the loan. This additional sum is to be held by Mellon in escrow and used to pay for insurance and taxes for the property. The fund serves the obvious purpose of protecting and preserving the value of Mellon Bank's mortgage on the property.

Although the funds themselves are personal property, for the reasons explained above the Court holds as a matter of federal bankruptcy law that they are not separate from the real estate within the meaning of section 1322(b)(2). The escrow funds, however much they might be, are certain to have negligible independent value in comparison to the real estate and are held for the purpose of protecting Mellon's mortgage. Escrow accounts are, moreover, a typical feature in every home mortgage, and to hold that their existence removes a mortgage from the anti-modification clause emasculates the statute. The Court cannot comprehend that Congress intended such a result.

Furthermore, as of the date of the bankruptcy filing, the Debtor was a number of months in arrears on his mortgage. This circumstance leads the Court to believe that there were no funds in existence on the date of the bankruptcy filing for a security interest to attach. Some courts have held that the nonexistence of personal property collat-

eral is in and of itself enough to prevent a mortgage from being removed from the protection of the anti-modification clause. *French*, 174 B.R. at 7; *In re Boisvert*, 156 B.R. 357 (Bankr.D.Mass.1993). *Contra In re Libby*, 200 B.R. 562, 567 (Bankr.D.N.J.1996) (holding that creditor's rights are determined from the face of the mortgage document and not by looking beyond it to whether a particular type of collateral actually exists).

In sum, the Court concludes that Mellon's mortgage is subject to the anti-modification clause. The mortgage does not take as collateral any property that is functionally or conceptually separate from the Debtor's real estate. Accordingly, the Debtor may not avoid the unsecured portion of Mellon's claim pursuant to section 506, 11 U.S.C. § 506.

### (B).

■ The Debtor next argues that he received an erroneous Act 6 notice from Mellon Bank and that as a result of receiving such notice the foreclosure judgment should be set aside, declared void and/or reopened. The Debtor's argument on this issue is ill founded.

■ Act 6 requires foreclosing creditors in certain instances to send debtors a notification containing the following information:

(1) The particular obligation or real estate security interest;

(2) The nature of the default claimed;

(3) The right of the debtor to cure the default as provided in section 404 of this act *and exactly what performance including what sum of money, if any, must be tendered to cure the default;*

(4) The time within which the debtor must cure the default;

(5) The method or methods by which the debtor's ownership or possession of the real estate may be terminated; and

(6) The right of the debtor, if any, to transfer the real estate to another person subject to the security interest or to refinance the obligation and of the transferee's right, if any, to cure the default.

41 P.S. § 403 (emphasis added). For mortgages to which Act 6 applies, sending notice is a precondition for initiating a foreclosure action or taking any other step toward obtaining possession of a debtor's residential real estate. Lack of notice is deemed to be a jurisdictional impediment to filing a foreclosure action or obtaining a judgement. *Bankers Trust Company v. Foust*, 424 Pa.Super. 89, 91 n. 1, 621 A.2d 1054, 1055 n. 1 (1993).

In this instance the Debtor claims that the notification he received did not state the exact amount necessary to cure his default. The Debtor does not present the mathematical basis for this assertion, but he states that a comparison between the Note and the Act 6 notice reveals a $20 discrepancy. The Notice indicated that a cure would be effected by tendering $1,097.85, as of the date of its issuance, whereas the Debtor argues that the proper amount should have been $1,117.75.

The Court is unable to verify the Debtor's numbers and the Court's own calculations show that the Notice was correctly computed. The Debtor's monthly payment, according to the notice was $211. Late charges, which equal 5% of the monthly payment of principal and interest ($171.48 per the note) totaled $8.57 (.05 × 171.48 = 8.57) per month. As of the date of the notice on June 20, 1996, the Debtor was five months in arrears. Based on these payment amounts, five months of arrears equals the exact amount listed on Mellon's Act 6 Notice, $1,097.85 (8.57 × 5 = 42.85 + (211 × 5 = 1,055) = 1,097.85). Accordingly, the Court finds that the Debtor has not met his burden of proof on this issue. Therefore there is no basis for the court to avoid or otherwise invalidate Mellon's foreclosure judgment. Finally, because the Court is unable to find any evidence of an Act 6 violation, there is no reason to consider whether Mellon Bank also violated the UDAP statute.

### (C).

In sum, the Court finds no basis to sustain any of the Debtor's claims against Mellon Bank and each such claim shall be dismissed.

### II.

The Court reaches a different conclusion, however, with regard to the Debtor's claims against Central Credit Fund, Inc. As ex-

plained below, these claims have substantial merit and entitle the Debtor to an award of damages.

### (A)(i).

The Debtor asserts that Central illegally took possession of his premises by acting without first providing the Debtor with notice as required by Act 91 of his right to apply for benefits from the Homeowners Emergency Mortgage Assistance Program ("HEMAP"). The Debtor further asserts that Central's failure to provide appropriate notice constitutes a violation of the catchall provision of UDAP, and gives the Debtor an actionable claim thereunder · for damages. The Court agrees with this argument and finds, if anything, that it is understated.

The court finds that Central did indeed act illegally in the manner in which it gained possession of the Debtor's house. The illegality not only includes Central's failure to provide the Debtor with notice under Act 91, but also includes its failure to give the Debtor notice under Act 6 and its use of self help to assume control of the premises. Moreover, once Central gained possession of the house, it breached its fiduciary obligation as a mortgagee-in-possession to maintain the house and not commit waste.

Act 91 explicitly requires that notice be given to residential mortgagors before a creditor may take action against them. The Act applies to all residential mortgages for premises used as a mortgagor's principal residence. 35 P.S. § 1680.401c(a)(2). With respect to notice, the pertinent provisions state:

§ 1680.402c. Notice and institution of foreclosure proceedings

(a) Before any mortgagee may accelerate the maturity of any mortgage obligation covered under this article, commence any legal action including foreclosure to recover under such obligation, or *take possession of any security of the mortgage debtor* for such mortgage obligation, such mortgagee

shall give the mortgagor notice as described in section 403–c.

35 P.S. § 1680.402c (emphasis added).

§ 1680.403c. Notice requirements

(a) Any mortgagee who desired to foreclose upon a mortgage shall send to such mortgagee at his or her last known address the notice provided in subsection (b): *Provided, however, That such mortgagor shall be at least sixty (60) days contractually delinquent* in his mortgage payments or be in violation of any other provision of such mortgage.

*Id.* § 1680.403c (emphasis added).

These sections spell out that an Act 91 notice must be sent to a Debtor in order for a mortgagee to take any action whatsoever against the mortgaged property, including any act to merely take possession of such property as opposed to attempting to actually foreclose thereon. A mortgagee is prohibited from even accelerating a loan until and unless the required notice is dispatched, and the notice cannot be sent earlier than the date on which the mortgagor becomes 60 days delinquent on the debt.

. There is no doubt that this section applied to Central Credit. The Debtor was the holder of a residential mortgage; he was in default; and Central wanted to take action to gain possession of the property. Accordingly, Central was obligated to send the Debtor an Act 91 notice and wait the appropriate period before taking any action.

Central's response to this argument is that the house was abandoned [1] and/or voluntarily surrendered by the Debtor and therefore was no longer the Debtor's principal residence. If true, this would have excused Central from having to send notification. *See* 35 P.S. § 1680.401c(a)(2) There is, however, absolutely no credible evidence that the property was abandoned. The Debtor's uncontradicted testimony was that he continued to reside at the property up to and including the date Central changed the locks. The only reason Central did not know this

---

1. The term "abandon" is used colloquially for as a legal matter title to real property may never be abandoned under Pennsylvania law. *Pocono*

*Springs Civic Association, Inc. v. MacKenzie,* 446 Pa.Super. 445, 449–50, 667 A.2d 233, 236 (1995).

information was because Hemighaus only visited the house twice, and both visits took place during the daytime when the Debtor was not home. In actuality, the house was secured and in good condition when Hemighaus saw it, and these conditions are directly at odds with the conclusion that the property was vacant.

The statement of the neighbor with whom Hemighaus alleges he spoke also does not establish abandonment. Although the neighbor said that Iris had separated from the Debtor, she also stated that she had seen the Debtor within as short a time period as the previous two weeks. Stating the someone has been seen within a two week period is more an indication of the person's presence than disappearance. The same conclusion applies to the evidence of the unopened mail. Even accepting as true the testimony that several days worth of unopened mail could be seen piling up through the mail slot, that observation in and of itself does not established that the property was abandoned. The presence of such mail, even unopened, could just as easily be interpreted as evidence of the house's continued occupancy.

The Court, however, does not believe that Hemighaus ever observed a pile of unopened mail. Hemighaus' testimony of having observed mail through a mail slot which he later acknowledged did not exist was completely incredible. Hemighaus was shown in this instance to have been caught in a lie, with the result being that the validity of his entire testimony is placed in doubt. Indeed, the revelation that he gave false testimony not only taints the truthfulness of his purported factual observations, it also stigmatizes his judgment and motivation. It is evidence of bad faith and ill will. Accordingly, the Court credits the testimony of the Debtor and concludes that he resided in his house up to and including the day Central locked him out.

The Court also finds Central's alternative theory that the Debtor voluntarily surrendered his property to be equally untenable. This argument is premised upon Exhibit D–6, the letter in which the Debtor indicates he is moving out of the property and gives permission to Central to assume the role of mortgagee-in-possession. Although Thomas McDonald touted this letter as absolute proof that the Debtor voluntarily surrendered the property, what he overlooks is the fact that the Debtor had already been locked out for a week by the time the letter was signed. During this week the Debtor was informed by Central's own employee, Ms. Jenkins, through conversations she had with the Debtor's sister Maria Alvarez, that the Debtor would not be allowed back in the property even if he paid the past due amount on the mortgage. The Court credits the testimony of Maria Alvarez as to the content of her conversations with Central Credit, and finds furthermore that Central told her that as a consequence of the default it did not need the Debtor's permission to enter his premises.

Thus, at the time the letter was signed, Central's possession of the premises was established as a *fait accompli,* which the Debtor believed he was powerless to change. Under these circumstances, the letter was not an expression of consent, but of resignation to the new status quo unilaterally achieved by Central. The credible and uncontradicted testimony of the Debtor is that he lived in and actively worked to improve and maintain the house for a period of three years. It is evident that however modest the property might have been, the Debtor took pride in it. The house was the Debtor's only residence. In light of this background, the assertion that the Debtor was ready to walk away from the property without any effort to retain it lacks the ring of truth, and is rejected.

Central's argument that the letter has the binding force of a contract is in error. Central is correct in asserting that signed contracts are binding regardless of whether the signatory read or understood the contents. This argument does not apply to the letter, however, because it is not a contract. The letter evidences no exchange of consideration. It is simply a notification to Central that the Debtor is gratuitously leaving the property and allowing Central to act as mortgagee-in-possession. The only question raised by the letter is the factual issue of whether it is a knowing and voluntary expression of consent to which the Court

should give credence. For the reasons indicated above, the Court finds that it is not.

The circumstances under which the letter was drafted provide further evidence that the Debtor had neither abandoned nor surrendered the property. According to McDonald, the impetus to draft the letter came from Hemighaus as he was observing the Debtor remove his property. Apparently upon observing the interior of the house and the amount and condition of the Debtor's personal belongings, Hemighaus came to the realization that his abandonment theory was unsupportable. Thus, it appears he decided to invent a new theory of voluntary surrender and advised McDonald to draft a document to that effect for them to attempt to have the Debtor sign. The Debtor then signed the letter at McDonald's urging based on McDonald's apparent authority and the Debtor's own lack of knowledge. No similar letter was ever used by Central in any other instance.

### (ii).

Central also acted unlawfully by failing to send the Debtor the notification required under Act 6. Act 6 applies to all residential mortgages, which it defines as mortgages in an initial principal amount of $50,000 or less covering real estate containing no more than two dwelling units. 41 P.S. § 101. Similar to Act 91, Act 6 requires that mortgagors be given notification of certain specified rights as a precondition for the lender taking action against them, including the acceleration of the debt or the taking of possession of the mortgaged property. *Id.* § 403(a). Notice must be sent no less than 30 days prior to the initiation of action against the debtor, *id.*, and must disclose to the debtor a number of things including: (1) the debtor's right to cure the default, and (2) the methods by which the debtor's ownership or possession of the real property may be taken away. *Id.* § 403(c)(3) & (5).

Act 6 certainly was applicable to Mr. Rodriguez being that he owned a single family home, and the mortgage was for less than $50,000. Accordingly, he should have been sent an Act 6 notice to inform him, among other things, of his right to cure the default in his mortgage payments. In this instance,

however, not only did Central fail to send him the required notification, it gave him false information of his rights by informing him that he did not have the ability to cure the default. In view of this misrepresentation, Central's violation of Act 6 was egregious.

The one exception to sending an Act 6 notice is when the property has been abandoned or voluntarily surrendered. As indicated above, this exception is not applicable in the present case.

### (iii).

Central acted unlawfully by using self help to obtain possession of the real estate. A mortgagee is entitled to possession of the subject real estate upon a default in performance by the mortgagor. *Erny v. Sauer,* 234 Pa. 330, 334, 83 A. 205, 206 (1912); *Peoples–Pittsburgh Trust Company v. Henshaw,* 141 Pa.Super. 585, 590, 15 A.2d 711, 714–15 (1940). If the mortgagee can gain possession without a breach of the peace, such as by acting with the mortgagee's permission, he can take possession without legal action, but otherwise is required to proceed by an action in ejectment. *Erny,* 234 Pa. at 334, 83 A. at 206; *Peoples–Pittsburgh Trust Company,* 141 Pa.Super. at 590, 15 A.2d at 714–15.

In this instance, Central did not have the Debtor's permission to enter upon and take control of his property, but did so nevertheless. Through the guise of using a locksmith Central broke and entered into the Debtor's home and proceeded to change the locks in order to keep the Debtor out. Under applicable Pennsylvania law, what of it there is, this action constituted a breach of the peace. In *Stewart v. F.A. North Company,* 65 Pa.Super. 195 (1916), the Superior Court found that a creditor committed a breach of the peace and became a trespasser when its agents broke into a debtor's house to repossess a piano. The creditor obtained entry into the house by breaking a window. The court rejected the creditor's defense that it had the right to break into the debtor's house by virtue of its contract and stated:

We are unwilling to give to the contract under consideration a construction which

would permit the lessor to batter down doors or break windows or engage in other acts of violence in the exercise even of an undoubted right to the possession of chattel.... This construction would subject many homes to invasion at the will of the lessors of pianos, sewing machines and other articles of household use and would be promotive or disorder and frequent breaches of the peace. The law affords adequate and orderly means of recovering [property] ... and on that remedy the lessor should rely without a resort to such force as amounts to a breaking and entering [into] a dwelling house....

*Id.* at 201.

Relying on *Stewart,* the court in *Laurel Coal Company v. Walter E. Heller & Co.,* 539 F.Supp. 1006 (W.D.Pa.1982), held that a creditor could be liable for committing a breach of the peace by cutting a chain on a fence to gain entry to a debtor's property. *Id.* at 1007. In reaching this conclusion the court remarked that it was consistent with the law's historical concern for the protection of real property interests and aversion to trespass. *Id.*

The Superior Court has even had occasion to remark that an ostensibly peaceful repossession can result in a constructive breach of the peace if done improperly. In *Jackson v. Richards 5 & 10, Inc.,* 289 Pa.Super. 445, 433 A.2d 888 (1981), the court stated:

We should like to note our displeasure with the appellee's method of repossessing the merchandise.... [I]t would appear that the appellee enlisted the aid of the Philadelphia police to effectuate the repossession. There is a line of authority that says that use of law enforcement agents in repossessions itself creates a constructive breach of peace.

*Id.* at 459 n. 11, 433 A.2d at 895 n. 11.

Accordingly, the Court holds that Central Credit unlawfully gained entry to the Debtor's home through the use of a self-help remedy that resulted in a breach of the peace. It is of no distinction that Central used a locksmith who presumably gained entry to the house by picking or disassembling the lock as opposed to a cruder method such as breaking a window. Either approach is offensive to the Debtor's right to the peaceable possession of his home and presents the possibility for escalating disorder should a homeowner react violently to the invasion.

(iv).

Having gained possession of the house, Central continued its errant ways by breaching its fiduciary duty as a mortgagee-in-possession to maintain the property in good productive condition. The responsibilities of a mortgagee-in-possession are aptly described by the Pennsylvania Superior Court in *Myers–Macomber Engineers v. M.L.W. Construction Corporation,* 271 Pa.Super. 484, 414 A.2d 357 (1979):

When a mortgagee goes into possession, he does not become the owner of the real estate.... Rather, he becomes a *quasi* trustee, managing the property for the benefit of the mortgagor, but at the same time protecting his own interest. *Zisman v. City of Duquesne,* 143 Pa.Super. 263, 18 A.2d 95 (1941); *McNicholas' Appeal,* 137 Pa.Super. 415, 9 A.2d 200 (1939). As a mortgagee in possession, his duty is to comport with the same standard of conduct as a prudent owner, *i.e.,* he must manage the property in a reasonably prudent and careful manner so as to keep it in a good state of preservation and productivity. *Landau v. Western Pennsylvania National Bank,* 445 Pa. 217, 282 A.2d 335 (1971); *Integrity Trust Co. v. St. Rita Building & Loan Asso.,* 317 Pa. 518, 177 A. 5 (1935). *See also:* Osborne, Mortgages s 168 (2d ed., 1970). The mortgagee in possession has a duty to collect the rents and profits which accrue during his occupancy and apply them to the mortgage debt. *Provident Trust Co. of Philadelphia v. Judicial Building & Loan Asso.,* [112 Pa.Super. 352, 171 A.287 (1934)] *supra.* Moreover, the mortgagor is entitled to an accounting from his mortgagee who has taken possession. *Landau v. Western Pennsylvania National Bank, supra; Winthrop v. Arthur W. Binns, Inc.,* 160 Pa.Super. 214, 50 A.2d 718 (1947).

*Myers Macomber Engineers,* 271 Pa.Super. at 489, 414 A.2d at 360; *accord In re Union Meeting Partners,* 165 B.R. 553, 563 (Bankr.

E.D.Pa.1994); *Winthrop v. Arthur W. Binns, Inc.*, 160 Pa.Super. 214, 216–17, 50 A.2d 718, 719 (1947).

In the present case, the Debtor claims that Central breached its fiduciary duty by allowing the property to fall into a state of disrepair. Central disavows responsibility for the property's dilapidation arguing that it maintained the property during the period of its management. Central asserts that the damage was sustained after December 1995 when it relinquished management to the Debtor and that it is not responsible for the property thereafter. Central's argument is flawed in at least two respects. First, Central admits that it never checked on the property during the time of its management prior to December 1995. Accordingly, Central has no proof as to when the property was actually damaged and is only speculating that it occurred thereafter.

Second, and more significantly, Central's argument fails because it never appropriately relinquished possession of the premises in the first place. In December 1995 the Debtor asked for the return of the property in exchange for satisfying the full amount of the second mortgage. The Debtor's offer was contingent on Central removing the tenant, and when Central refused to remove the tenant the Debtor withdrew the offer. Nevertheless, Central unilaterally ceased management of the property and turned over responsibility for the tenant to the Debtor whether he wanted it or not.

Central's action was insufficient to terminate its responsibility for the property consistent with its fiduciary duty to manage the property for the Debtor's benefit. The Debtor had no experience in the real estate business and lacked even the most rudimentary ability to manage the property in an appropriate manner. Thus it is inconceivable that any person acting prudently would leave the Debtor in charge of the property while occupied by a tenant. Doing so was a self-evident prescription for disaster. Moreover, it does not appear that Central even made the least effort to transition the management of the property to the Debtor. There is no evidence that Central informed the tenant of the change in management, and Central did not even assign to the Debtor its lease with the tenant. The failure to assign the lease alone made it extraordinarily difficult for the Debtor to deal with the tenant effectively. Without a lease the Debtor had no authority under which to collect the rents or seek eviction through the filing of a landlord tenant action. Suffice it to say Central's conduct in relationship to the property fell far short of the prudent owner standard to which it was duty bound to adhere. Under the circumstances of this case, the prudent owner standard required Central to return the property to the Debtor free of the tenant and in an immediately habitable condition. Central's failure in this regard was a breach of duty.

#### (B).

The Debtor has established that Central acted unlawfully in its acquisition and management of his property. The next issue is whether the Debtor's evidence states a claim under UDAP. UDAP prohibits the use of unfair or deceptive acts and practices in the conduct of any trade or commerce, 73 P.S. § 201–3, and provides individuals with a private right of action to recover actual damages resulting from the use of a prohibited practice in connection with a consumer's purchase or lease of goods or services for personal, family or household purposes that results in an ascertainable loss of money or property. *Id.* § 201–9.2.

The Debtor's ability to establish most of these elements is straight forward. It is established that mortgage lending is a trade or commerce subject to the statute. *In re Smith*, 866 F.2d 576, 581–82 (3d Cir.1989); *In re Andrews*, 78 B.R. 78, 82 (Bankr. E.D.Pa.1987). It is undisputed that the Debtor purchased the subject goods and services for personal, family and household purposes. The instant lending transaction evolved out of the Debtor's purchase of windows for installation on his personal residence. The Debtor has suffered an ascertainable loss of money and property in that his house was taken from him and damaged.

An issue that requires greater explanation is whether Central engaged in any unfair or deceptive acts or practices. The specific acts

784

and practices deemed under the statute to be unfair or deceptive are defined at 73 P.S. § 201–2(4)(i)–(xxi). In this case, the Debtor asserts that Central violated the so called catchall provision in subsection 201–2(4)(xxi). This provision prohibits an entity from, "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." *Id.* It should be noted that this section was recently amended by the Pennsylvania legislature which added the words "or deceptive" to the statute following "fraudulent". Act of Dec. 4, 1996, P.L. 906, No. 146, § 1.

■ The Pennsylvania Superior Court, in cases arising under UDAP prior to the effective date of the amendment, has held that liability under the catchall section is established by proving the elements of common law fraud. *Sewak v. Lockhart,* 699 A.2d 755, 761 (1997); *Burkholder v. Cherry,* 414 Pa.Super. 432, 440, 607 A.2d 745, 749 (1992); *Prime Meats, Inc. v. Yochim,* 422 Pa.Super. 460, 469–70, 619 A.2d 769, 773–74 (1993). In arriving at this holding, the Superior Court rejected the position of the Pennsylvania Attorney General that the section was an attempt to create a new variety of statutory fraud free from the traditional requirements of fraud under the common law. *Chatham Racquet Club v. Commonwealth of Pennsylvania,* 127 Pa.Cmwlth. 209, 216–17, 561 A.2d 354, 357–58 (1989); *Prime Meats,* 422 Pa.Super. at 470, 619 A.2d at 774 (1993). The Superior Court's cases were also a rejection of rulings from the United States Bankruptcy Court for the Eastern District of Pennsylvania, per Chief Judge David A. Scholl, who concurred with the view of the Attorney General that the basis for liability under UDAP was broader than an action for fraud under the common law. *In re Fricker,* 115 B.R. 809, 819–20 (Bankr.E.D.Pa.1990); *In re Andrews,* 78 B.R. 78, 82–83 (Bankr.E.D.Pa. 1987). Among other things, Judge Scholl always maintained that a cause of action under the catchall section of UDAP can be maintained by proving the existence of illegality in a transaction, stemming for instance from the violation of other consumer protection statutes, which he held to be a *per se* violation of UDAP. *Fricker,* 115 B.R. at 820;

*In re Russell,* 72 B.R. 855, 871 (Bankr. E.D.Pa.1987). The legislature's amendment to the statute signals approval of these less restrictive interpretations of UDAP, and is an affirmation of the position of the Pennsylvania Supreme Court that UDAP is a remedial law that must be liberally interpreted for the purpose of abating unfair and deceptive practices. *Creamer v. Monumental Properties, Inc.,* 459 Pa. 450, 460, 329 A.2d 812, 816 (1974) ("[s]ince the Consumer Protection Law was in relevant part designed to thwart fraud in the statutory sense, it is to be construed liberally to effect its object of preventing unfair or deceptive practices").

■ In this instance, the Debtor is able to prove a violation of UDAP by establishing common law fraud.

Actual fraud has five elements which must coalesce. There must be (1) misrepresentation of a material fact; (2) scienter; (3) intention by the declarant to induce action; (4) justifiable reliance by the party defrauded upon the misrepresentation; and (5) damages to the party defrauded as a proximate result.

*Prime Meats,* 422 Pa.Super. at 469, 619 A.2d at 773 (quoting *Rizzo v. Michener,* 401 Pa.Super. 47, 61, 584 A.2d 973, 980 (1990)). When a party is under a legal duty to make a disclosure the mere nondisclosure of information can constitute a misrepresentation. *Johnson v. Hyundai Motor America,* 698 A.2d 631, 637 (1997).

Central made a number of misrepresentations to the Debtor. Central misrepresented its right to assume control of the house without the Debtor's permission or the use of legal process. This misrepresentation occurred as a result of the statements of Ms. Jenkins and was also impliedly communicated to the Debtor as a result of Central's conduct. Central misrepresented to the Debtor his right to cure the default on his mortgage pursuant to Act 6. 41 P.S. § 404. This misrepresentation resulted from the express statements of Central's agents and from its failure to send the Debtor an Act 6 notice which constituted an act of nondisclosure. Central misrepresented the Debtor's right to apply for emergency mortgage assistance through HEMAP. This misrepresen-

tation resulted from Central's failure to fulfill its duty to send to the Debtor an Act 91 notice as required by law. Central also misrepresented its fiduciary duty to the Debtor as mortgagee-in-possession when it refused to assume responsibility for removing its tenant and returning the property to the Debtor ready for occupancy.

Central knew that these misrepresentations were false. The legal necessity of sending notices under Act 6 and Act 91, the need to use legal process to remove the Debtor from his house, the Debtor's right to cure a default and the fiduciary duties of a mortgagee-in-possession, are all such fundamental aspects of the mortgage foreclosure or repossession process that Central had to be aware of these things by virtue of being an experienced participant in the consumer lending business. Mr. McDonald, in fact, testified that he has been president of Central for seven and a half years and that most of Central's loans are secured by residential real estate. Based on his experience, the Court finds that McDonald was familiar with legalities of the foreclosure and repossession process and was aware that Central's representations were all false.

Central intended to induce action on the part of the Debtor. It intended to induce him to permit Central to take over his property and rent it to another person, using the rental proceeds to satisfy the debt. Central also intended to induce the Debtor to remove its tenant himself and accept the house in a dilapidated condition.

The Debtor justifiably relied on Central's representations and permitted it to take control of the property. After the locks were changed the Debtor remained out of the property and allowed Central to do what it wanted. The Debtor's reliance was justifiable because the Debtor and his family presumed that Central, as an experienced mortgage lender, was conforming its behavior to the law. The Debtor also relied on Central's representations regarding his responsibility to remove the tenant, and he attempted to find a lawyer to perform an eviction.

The Debtor suffered damages as a proximate result of the misrepresentations. Central's possession of the house led to it being damaged and vandalized. Moreover, it is evident that the Debtor must have incurred additional liability as a result of being homeless and that the eviction must have caused him to endure a fair amount of emotional stress and pain.

Central also committed a *per se* violation of UDAP as a result of the pervasive illegality which characterized every aspect of its conduct in this case. *See Russell,* 72 B.R. at 871; *Fricker,* 115 B.R. at 823. In the course of its dealings with the Debtor Central violated two consumer protection statutes, Act 6 and Act 91, committed an illegal self-help eviction in which it broke, entered and trespassed in the Debtor's house, and violated its fiduciary duty as a mortgagee-in-possession by allowing the house to be trashed while under its control. This conduct was deceptive and caused confusion and misunderstanding.

### (C).

Under UDAP, the Debtor is entitled to an award of actual damages. 73 P.S. § 201–9.2 In the case of damage to real estate, where the injury is repairable, damages equal the cost of repairs, limited by the value of the real estate itself. *Richards v. Sun Pipe Line Company,* 431 Pa.Super. 429, 435, 636 A.2d 1162, 1165 (1994); *Babich v. Pittsburgh & New England Trucking Co.,* 386 Pa.Super. 482, 485, 563 A.2d 168, 170 (1989); *Kirkbride v. Lisbon Contractors, Inc.,* 385 Pa.Super. 292, 298–99, 560 A.2d 809, 812 (1989).

In this instance, the Debtor produced a repair estimate from a contractor totaling $13,751.97. This estimate is limited to the work necessary to refurbish the surface areas and related fixtures throughout the house, *i.e.,* the floors, walls, ceilings, lights, cabinets, doors, etc. It does not include the cost to repair damage to the electrical system, broken heater, leaking roof or plumbing. Although Central has not disputed the estimate, the Court has concern lest the repairs contemplated by the contractor operate to put the house in even better condition than it was prior to the lockout. Nevertheless, the Court will accept the estimate since

it does not include the full amount of work necessary to completely restore the house, i.e., the electric, heat, roof and plumbing work. The fact that the Debtor and his brother may be doing some of the work themselves does not justify a reduction to the cash amount of the damages. The Debtor has been forced to do the work himself and depend on family precisely because he lacks the cash to pay a contractor. Accordingly, the Court finds that the Debtor has suffered actual damages in the amount of $13,751.97.

 The Debtor also requests as damages the rental value of the property from December 1995 to October 1996. During this period of time Central ceased collecting rent for the property even though it had not effectively caused the property to be returned to the Debtor. Pursuant to its role as mortgagee-in-possession Central should have continued to collect the rents, and, therefore, the Debtor is entitled to receive this component of damages. Measured at $450 per month, the rental charged by Central for the property, for 11 months, the Debtor is entitled to an additional award of $4,950, for a total award of actual damages equal to $18,701.97.

 The Court also finds that the Debtor is entitled to treble damages. UDAP gives courts the discretion to award a plaintiff up to three times his actual damages. 73 P.S. § 201–9.2. In *Johnson v. Hyundai Motor America*, 698 A.2d at 631, the Superior Court had occasion to discuss the standards for awarding treble damages under UDAP. The court noted that the customary requirement of outrageous conduct is not present in the statute. The court still held that when exercising the discretion to award treble damages courts should be guided by the principles traditionally related to awards of punitive damages generally. *Id.* at 639.

[T]he purpose of punitive damages is to punish outrageous and egregious conduct done in a reckless disregard of another's rights; it serves a deterrence as well as a punishment function. *Schecter v. Watkins*, 395 Pa.Super. 363, 383–84, 577 A.2d 585, 595 (1990). Therefore, under the law of this Commonwealth, a court may award punitive damages only if an actor's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others. *SHV Coal, Inc. v. Continental Grain Co.*, 526 Pa. 489, 493, 587 A.2d 702, 704 (1991); *Rizzo v. Haines*, 520 Pa. 484, 555 A.2d 58 (1989).

*Johnson*, 698 A.2d at 639. This court cannot state more strongly that it was outraged by Central's conduct. Central's treatment of the Debtor was cumulatively egregious, malicious, wanton, willful and oppressive. Central did not merely exhibit a reckless disregard for the Debtor's rights, it purposefully trampled upon those rights. The sanctity of a person's home and the protection of the privacy and property rights associated therewith receives high protection within the tradition of our laws. Central's rogue collection tactics ran roughshod over the Debtor's property rights and must be punished and deterred. The collection of a debt simply does not justify breaking and entering upon a person's home. Accordingly, the court will award the Debtor treble damages in an amount three times in excess of his actual damages, equal to $56,105.91.[2] The court will also award Debtor's counsel attorney's fees.

2. Lest it be argued that this award is excessive, it should be remembered that it could have been even higher. The Debtor certainly could have sued Central for trespass in which case he would have been entitled to receive the full panoply of damages available to the typical tort claimant including compensation for emotional harm. Moreover, in a trespass action there would be no arbitrary limitation on the amount of punitive damages that could be ordered. Most likely the Debtor did not bring a claim for trespass out of concern that the two year statute of limitations on such an action had lapsed. The statute of limitations on an action under UDAP, however, has not lapsed because the Superior Court has held that UDAP is subject to a six-year limitations period. *Gabriel v. O'Hara*, 368 Pa.Super. 383, 394, 534 A.2d 488, 494 (1987).